**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: GRAND JURY INVESTIGATION
M.H.,

M.H.,
                    *Witness-Appellant,*

                    v.

UNITED STATES OF AMERICA,
                              *Appellee.*

No. 11-55712

D.C. No.
10-GJ-0200

OPINION

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, Chief District Judge, Presiding

Argued and Submitted
June 24, 2011—Pasadena, California

Filed August 19, 2011

Before: William C. Canby, Jr., Ronald M. Gould, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

**COUNSEL**

Pamela J. Naughton and Rebecca S. Roberts, Sheppard Mullin Richter & Hampton LLP, San Diego, California, for appellant M.H.

Frank P. Cihlar, Gregory Victor Davis, Alexander P. Robbins, Tax Division, Department of Justice, Washington, D.C., for appellee United States of America.

**OPINION**

TALLMAN, Circuit Judge:

Appellant M.H. is the target of a grand jury investigation seeking to determine whether he used secret Swiss bank

accounts to evade paying federal taxes. The district court granted a motion to compel M.H.'s compliance with a grand jury subpoena duces tecum demanding that he produce certain records related to his foreign bank accounts. The court declined to condition its order compelling production upon a grant of limited immunity and, pursuant to the recalcitrant witness statute, 28 U.S.C. § 1826, held M.H. in contempt for refusing to comply. M.H. appealed.

The foreign bank account information the Government seeks is information M.H. is required to keep and maintain for inspection under the Bank Secrecy Act of 1970 (BSA), 31 U.S.C. § 5311, and its related regulations. M.H. argues that if he provides the sought-after information, he risks incriminating himself in violation of his Fifth Amendment privilege. He asserts that the information he is being asked to produce might conflict with other information M.H. has previously reported to the Internal Revenue Service (IRS). Production might reveal, for instance, that he has accounts he has not reported or that the information he *has* previously reported is inaccurate. On the other hand, if M.H. denies having the records, he risks incriminating himself because failing to keep the information when required to do so is a felony.

The district court concluded that under the Required Records Doctrine, the Fifth Amendment did not apply. That doctrine recognizes that when certain conditions are met, records required to be maintained by law fall outside the scope of the privilege. We agree that, under the Required Records Doctrine, the Fifth Amendment does not apply. We therefore affirm the district court's order of contempt for failing to produce the information the grand jury sought.

## I

In 2009, as part of a deferred-prosecution agreement with the United States Department of Justice, the Swiss bank UBS AG (UBS) provided the federal government with bank

account records identifying approximately 250 U.S. taxpayers UBS might have aided in committing tax evasion. The UBS records showed that in 2002, M.H. transferred securities from his UBS account to a different Swiss bank, UEB Geneva. IRS agents began investigating him.

In June 2010, a San Diego federal grand jury issued a subpoena duces tecum to M.H. for records he was required to keep pursuant to Treasury Department regulations governing offshore banking. The subpoena demanded production of:

> [a]ny and all records required to be maintained pursuant to 31 C.F.R. § 103.32 [subsequently relocated to 31 C.F.R. § 1010.420] relating to foreign financial accounts that you had/have a financial interest in, or signature authority over, including *records reflecting the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during each specified year.*

(Emphasis added).[1] M.H. declined to provide the requested information and also declined to deny having it, reasoning that either response posed a risk of self-incrimination under the Fifth Amendment to the United States Constitution. The district court ordered him to comply anyway. When he again refused to produce the requested documents, the court conducted a show-cause hearing for failing to comply with its order and found him in contempt. However, because the district court considered M.H.'s arguments "substantial and worthy of appellate review," the court stayed the contempt order pending appeal, contingent on M.H.'s posting of a $250,000

---

[1]The regulation cited in the subpoena, 31 C.F.R. § 103.32, has since been relocated to 31 C.F.R. § 1010.420. For ease of reference, this opinion will refer to the current citation.

cash bond. M.H. is not currently incarcerated and may travel without restriction.

The information identified in the subpoena mirrors the banking information that 31 C.F.R. § 1010.420[2] requires taxpayers using offshore bank accounts to keep and maintain for government inspection. The information the subpoena seeks is also identical to information that anyone subject to § 1010.420 already reports to the IRS annually through Form TD F 90-22.1, known as a "Report of Foreign Bank and Financial Accounts," or "FBAR." Therefore, the information at issue in this contempt proceeding is information that M.H. —if he has a foreign bank account and meets other qualifications specified in the BSA—must keep, report to the Treasury Department, and maintain for IRS inspection.

## II

We review de novo mixed questions of law and fact contained within the analysis of a civil contempt proceeding. *Shoen v. Shoen*, 48 F.3d 412, 414 (9th Cir. 1995). We review for clear error any factual findings underlying the contumacious behavior. *United States v. Bright*, 596 F.3d 683, 694 (9th Cir. 2010). Where incarceration has been stayed pending appeal and no party is harmed by the delay, we may exceed

---

[2]The regulation reads, in relevant part:

Records of accounts required by [31 C.F.R. § 103.24 (relocated to 31 C.F.R. § 1010.350)] to be reported to the Commissioner of Internal Revenue shall be retained by each person having a financial interest in or signature or other authority over any such account. Such records shall contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period. Such records shall be retained for a period of 5 years and shall be kept at all times available for inspection as authorized by law.

the thirty-day time limit for deciding appeals that § 1826 would otherwise impose. *In re Grand Jury Witness*, 695 F.2d 359, 361 n.4 (9th Cir. 1982).

## III

### A

**[1]** As a preliminary matter, M.H. argues that—for a number of reasons—§ 1010.420 does not apply to him, so he is not required to comply with the grand jury's subpoena and we need not reach the Fifth Amendment question. But at this point in its investigation, the Government need not prove the regulation or the BSA apply. It need only show a "reasonable possibility" that the subpoena will serve the grand jury's legitimate investigative purpose. *United States v. R. Enters., Inc.*, 498 U.S. 292, 300-01 (1991).

The Government is not required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of its inquiry is to establish whether probable cause exists to accuse the taxpayer of violating our tax laws. *See id.* at 297 ("The grand jury occupies a unique role in our criminal justice system. It is an investigatory body charged with the responsibility of determining whether or not a crime has been committed. Unlike this Court, whose jurisdiction is predicated on a specific case or controversy, the grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.' " (citation omitted)).

**[2]** There are, of course, limits to the grand jury's authority. *See, e.g*, *id.* at 299 (stating that a grand jury may not "engage in arbitrary fishing expeditions" or base its investigation on "malice or an intent to harass"). But there is no evidence of excess here. We have examined the evidence in the sealed record along with the evidence the district court reviewed in

camera. That evidence confirms that the grand jury's inquiry is a legitimate exercise of its investigatory authority. If it is later established that, for whatever legal reason, the regulation at issue does not apply to M.H., then the Government will be unable to successfully prosecute him and there is no risk of a Fifth Amendment violation. Until then, however, M.H.'s obligation to comply with the grand jury subpoena is not contingent upon whether the Government has proven the BSA and its regulations apply to him as a U.S. taxpayer who has previously filed FBARs with the Department of the Treasury.

**B**

**[3]** M.H. argues that the Required Records Doctrine—which, if it applies, renders the Fifth Amendment privilege inapplicable—does not apply to this case and that the district court erred in finding otherwise. The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The Supreme Court has held that where documents are *voluntarily* created and kept, compelling their disclosure does not implicate the privilege against self-incrimination. *See United States v. Doe*, 465 U.S. 605, 611-12 (1984) (citing *Fisher v. United States*, 425 U.S. 391, 409-10 (1976)). Where documents are *required* to be kept and then produced, they are arguably compelled. However, the Supreme Court has recognized that in such circumstances, the privilege does not extend to records required to be kept as a result of an individual's voluntary participation in a regulated activity. *See Shapiro v. United States*, 335 U.S. 1, 17 (1948) (noting that the nature of documents and the capacity in which they are held may indicate that "the custodian has voluntarily assumed a duty which overrides his claim of privilege" (quoting *Wilson v. United States*, 221 U.S. 361, 380 (1911))). Our task is to determine whether the records sought in this case fall into the former or latter category. If they fall into the latter, the Required Records Doctrine applies and the privilege is

unavailable to M.H., who has voluntarily participated in a regulated activity.

**[4]** In *Shapiro*—credited for establishing the principles of what has come to be known as the Required Records Doctrine —the Supreme Court required a wholesaler of fruit and produce to turn over certain records he was obliged to keep and maintain for examination pursuant to the Emergency Price Control Act, which applied in part to records "customarily kept." *See Marchetti v. United States*, 390 U.S. 39, 55 (1968). The Court reasoned that the Required Records "principle applies not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." *Shapiro*, 335 U.S. at 17.

Twenty years after *Shapiro*, the Court considered two cases that examined whether being required to pay an excise tax on one's gambling wagers violated the Fifth Amendment. Those two cases were *Marchetti* and *Grosso v. United States*, 390 U.S. 62 (1968). In its analysis in those cases, the Court identified three principles from *Shapiro* that distinguished it from *Grosso* and *Marchetti* where, the Court concluded, the Required Records Doctrine did not apply. *See Marchetti*, 390 U.S. at 56-57 ("We think that neither *Shapiro* nor the cases upon which it relied are applicable here. . . . Each of the three principal elements of the [Required Records Doctrine], as it is described in *Shapiro*, is absent from this situation."); *Grosso*, 390 U.S. at 67-68 ("The premises of the [Required Records Doctrine], as it is described in *Shapiro*, are evidently three: first, the purposes of the United States' inquiry must be *essentially regulatory*; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has *customarily kept*; and third, the records themselves must have assumed '*public aspects*' which render them at least analogous to public documents. . . . [B]oth the

first and third factors are plainly absent from this case." (emphasis added)).

Since *Grosso* and *Marchetti*, the Supreme Court has applied *Shapiro* and the principles underlying the Required Records Doctrine broadly to "items that are the legitimate object of the government's noncriminal regulatory powers," *Baltimore City Dept. of Soc. Servs. v. Bouknight*, 493 U.S. 549, 557 (1990), regardless of whether they are required to be kept and regardless of whether they are records. *See, e.g.*, *California v. Byers*, 402 U.S. 424, 427-31 (1971) (applying Required Records Doctrine principles and concluding that a state statute requiring drivers involved in vehicle accidents to stop at the scene of the accident and leave their names and addresses for police did not infringe the Fifth Amendment); *Bouknight*, 493 U.S. at 558 (applying the Required Records Doctrine to determine that a parent lacked a Fifth Amendment privilege in producing her child in response to a court's order).

**[5]** We have recognized that the three principles announced in *Grosso* define the Required Records Doctrine, but have also adopted the Supreme Court's flexibility in applying those principles. *See In re Grand Jury Proceedings (Doe M.D.)*, 801 F.2d 1164, 1168 (9th Cir. 1986) ("Under [the Required Records Doctrine], the Fifth Amendment privilege does not apply if: (1) the purpose of the government's inquiry is regulatory, not criminal; (2) the information requested is contained in documents of a kind the regulated party customarily keeps; and (3) the records have public aspects."); *see also U.S. SEC v. Fehn*, 97 F.3d 1276, 1291-92 (9th Cir. 1996) (observing that we have applied the Required Records Doctrine "principles in a variety of contexts, and have accorded them varying emphasis").

Even though M.H. is being asked to turn over reports he is required to keep pursuant to the BSA and its regulations, the Government, citing *Byers*, *Bouknight*, and *Fehn*, suggests that

all three requirements need not be met. While it is true that when the Required Records Doctrine is applied to items other than records a rigid application of all three factors may not be necessary, *see, e.g.*, *Bouknight*, 493 U.S. at 558-60 (applying the "principles" of the Required Records Doctrine and concluding that a mother compelled to produce her child through a court order could not invoke a Fifth Amendment privilege against self-incrimination to resist the order); *United States v. Des Jardins*, 747 F.2d 499, 507-09 (9th Cir. 1984) (concluding that the Fifth Amendment privilege does not apply to a requirement under the BSA that travelers transferring more than $5,000 out of the country file a written report, but considering only whether the regulation at issue was essentially regulatory or criminal in nature), *rev'd on other grounds*, 772 F.2d 578 (9th Cir. 1985), we need not resolve that issue here. Even if we assume, for purposes of decision, that all three prongs of the test set forth in *Grosso* apply, we conclude that all three requirements are met in this case.

### 1.   "Essentially regulatory"

We begin by recognizing that when compelled disclosure has incriminating potential, "the judicial scrutiny is invariably a close one." *Byers*, 402 U.S. at 427. In evaluating the danger of incrimination, we consider whether the requirement in question is essentially regulatory or criminal in nature. *Doe M.D.*, 801 F.2d at 1168. In doing so, "[i]t is irrelevant that records kept for regulatory purposes may be useful to a criminal grand jury investigation." *Id.* Instead, we consider whether the statutory or regulatory requirement involves an area "permeated with criminal statutes," whether it is "aimed at a highly selective group inherently suspect of criminal activities," *Des Jardins*, 747 F.2d at 508 (internal citations and quotation marks omitted), and whether complying with the requirement would "generally . . . prove a significant 'link in a chain' of evidence tending to establish guilt." *Id.* at 509 (internal quotation marks omitted). M.H. argues that, for sev-

eral reasons, the BSA's record-keeping provision is criminal in nature, not regulatory. Our precedent indicates otherwise.

**[6]** M.H. first argues that § 1010.420 is criminal in nature because the BSA's "primary purpose is to detect criminal conduct, specifically money laundering, terrorism and tax evasion." To support this position, M.H. points to language in the BSA describing the purpose of the statute as requiring "certain reports or records, where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism." *See* 31 U.S.C. § 5311. M.H. also cites language from the IRS Web site describing the BSA as the first law to fight money laundering in the United States, along with legislative history indicating congressional interest in combating criminal activity.

**[7]** The Supreme Court has already considered and rejected these arguments as they relate to the BSA generally. In *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 76-77 (1974), the Court observed that the goal of assisting in the enforcement of criminal laws "was undoubtedly prominent in the minds of the legislators," as they considered the BSA. However, it noted that "Congress seems to have been equally concerned with civil liability which might go undetected by reason of transactions of the type required to be recorded or reported." *Id.* at 76. The Court concluded that "the fact that a legislative enactment manifests a concern for the enforcement of the criminal law does not cast any generalized pall of constitutional suspicion over it." *Id.* at 77. Therefore, that Congress aimed to use the BSA as a tool to combat certain criminal activity is insufficient to render the BSA essentially criminal as opposed to essentially regulatory.

Turning to the specific regulation in question, our analysis in *Des Jardins* is informative. There, we considered whether a particular BSA record-reporting provision, which required

travelers to report transporting more than $5,000 in monetary instruments across the United States border, was essentially criminal in nature and determined it was not. In that case, a U.S. Customs Agent working at the Los Angeles International Airport—as part of a project to detect narcotics-related criminal activity—noticed that Des Jardins's travel route paralleled those drug couriers frequently took. *Des Jardins*, 747 F.2d at 501. The agent inspected Des Jardins's luggage and found $5,000. Upon searching Des Jardins's person, the agent discovered several thousand more dollars. *Id.* at 502. Des Jardins was ultimately convicted for violating the reporting requirement.

We considered whether the reporting requirement violated Des Jardins's Fifth Amendment privilege, and we analyzed whether the fact that the regulation was not "*exclusively* regulatory" made it essentially criminal. *Id.* at 508-09 (emphasis added). We determined it did not. *Id.* at 509. We reasoned in part that "[s]ince the transportation of monetary instruments in such amounts is not itself illegal and since there is no reason to suppose that the transportation of monetary instruments in such amounts is generally connected with criminal activity, the vast majority of people subject to the requirement are not suspect of illegality." *Id.*

**[8]** The same can be said here. There is nothing inherently illegal about having or being a beneficiary of an offshore foreign banking account. According to the Government, § 1010.420 applies to "hundreds of thousands of foreign bank accounts—over half a million in 2009." Nothing about having a foreign bank account on its own suggests a person is engaged in illegal activity. That fact distinguishes this case from *Marchetti* and *Grosso*, where the activity being regulated—gambling—was almost universally illegal, so that paying a tax on gambling wagers necessarily implicated a person in criminal activity. Admitting to having a foreign bank account carries no such risk. That the information contained in the required record may ultimately lead to criminal charges

does not convert an essentially regulatory regulation into a criminal one. *See Des Jardins*, 747 F.2d at 508; *see also Marchetti*, 390 U.S. at 57.

Considering whether the sought-after information would likely serve as a significant chain in a link of evidence establishing guilt, we found relevant in *Des Jardins* the nature of the specific information travelers were required to report (the legal capacity in which the person filing the report was acting; the origin, destination, and route being traveled; and the amount and kind of monetary instruments transported). We concluded that because such evidence lacked an inherently criminal quality, it would not likely serve as a significant link in a chain of evidence. *Des Jardins*, 747 F.2d at 508-09.

**[9]** M.H. was required to maintain, and through the subpoena is being asked to produce, the following information:

    (1) The name in which each account is maintained;

    (2) The number or other designation of such account;

    (3) The name and address of the foreign bank or other person with whom such account is maintained;

    (4) The type of such account;

    (5) The maximum value of each such account during the reporting period.

**[10]** This information is not inherently criminal. As in *Des Jardins*, it is the act of *not* reporting (or in this case the act of *not* maintaining for inspection) the information that suggests criminality, not the information itself. Because the information being requested of M.H. is not inherently criminal, being required to provide that information would generally not establish a significant link in a chain of evidence tending to prove guilt. *See Des Jardins*, 747 F.2d at 509 ("Since the

requirement concerns such relatively innocuous matters . . . any information obtained would be at best tangentially related to criminal activity."); *see also Wilson*, 221 U.S. at 380 ("But the physical custody of incriminating documents does not of itself protect the custodian against their compulsory production. The question still remains with respect to the nature of the documents and the capacity in which they are held.").

**[11]** M.H. suggests that *Des Jardins* should not apply because in that case we considered a reporting requirement instead of a record-keeping requirement. But *Des Jardins*'s analysis of whether the regulation in question was essentially regulatory did not hinge on the "reporting" aspect of the regulation. *Des Jardins* relied on cases interpreting the Required Records Doctrine and is clearly applicable to the "essentially regulatory" aspect of that doctrine, which does not turn on whether a reporting requirement exists, but—as we have already explained—on whether the information sought is inherently criminal in nature. While *Des Jardins* does not answer the precise question at issue in this case, we apply the rules recognized there to inform our Fifth Amendment inquiry. Those rules suggest that because § 1010.420 does not target inherently illegal activity or a highly selective group of people inherently suspect of criminal activity, it is essentially regulatory, not criminal.

We have held that whether a requirement to maintain records involves a reporting requirement is not determinative for purposes of deciding whether it is essentially regulatory. *See United States v. Rosenburg*, 515 F.2d 190, 199-200 (9th Cir. 1975) (holding that the Required Records Doctrine applied even though the statute in question only required records to be kept for two years and did "not expressly provide that records shall be open to inspection by state officials"). Thus, the lack of an "automatic" reporting requirement does not mean § 1010.420 is not essentially regulatory. This conclusion makes sense because, as we have already explained, the heart of the "essentially regulatory"

inquiry is whether the regulation in question targets inherently illegal activity. As we observed in *Rosenburg*, where the purpose of the record-keeping requirement "is to aid in the enforcement of" the statutory scheme, the Required Records Doctrine may apply, regardless of whether the regulation itself includes a reporting requirement, automatic or otherwise. *Id.* at 200.

Moreover, § 1010.420 *has* a reporting requirement. The regulation mandates that the required records "shall be kept at all times available for inspection as authorized by law." The Supreme Court has indicated that no meaningful difference exists "between an obligation to maintain records for inspection, and such an obligation supplemented by a requirement that those records be filed periodically with officers of the United States." *Marchetti*, 390 U.S. at 56 n.14.

Because § 1010.420 is essentially regulatory in nature, we conclude that the first prong of the Required Records Doctrine is satisfied.

## 2.    Customarily Kept

**[12]** We have not assigned a specific definition to the term "customarily kept," but records appear to be customarily kept if they would typically be kept in connection with the regulated activity. As the case law dealing with this requirement suggests, the Fifth Amendment does not apply when the Government compels individuals to create records that they would customarily keep.

In *Shapiro*, the records a fruit wholesaler "customarily kept" in compliance with the Emergency Price Control Act of 1942 were not privileged. By contrast, in *Marchetti*, records regarding a person's gambling expenses were deemed *not* customarily kept and were privileged. Some courts have recognized records as "customarily kept" where they are required to be retained as part of the general regulatory scheme, as they

were in *Shapiro*. *See, e.g.*, *In re Doe*, 711 F.2d 1187, 1191 (2d Cir. 1983) ("That the W-2s are records of a kind customarily kept by taxpayers is not open to dispute."). Most, however, seem to simply make a cursory statement that the records are, or are not, customarily kept. *See, e.g.*, *Doe M.D.*, 801 F.2d at 1168 (concluding without analysis that "it is evident that Doe customarily maintained the documents in his possession").

**[13]** The information that § 1010.420 requires to be kept is basic account information that bank customers would customarily keep, in part because they must report it to the IRS every year as part of the IRS's regulation of offshore banking, and in part because they need the information to access their foreign bank accounts. That M.H.'s bank keeps the records on his behalf does not mean he lacks access to them or that they are records offshore banking customers would not customarily keep. A bank account's beneficiary necessarily has access to such essential information as the bank's name, the maximum amount held in the account each year, and the account number. Both common sense and the records reviewed in camera support this assessment. We conclude that the records sought are customarily kept.

### 3.   "Public aspects"

**[14]** The Supreme Court has recognized that if the government's purpose in imposing the regulatory scheme is essentially regulatory, then it necessarily has some "public aspects." *Shapiro*, 335 U.S. at 33 (noting that "the privilege which exists as to private papers cannot be maintained in relation to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established" (citation and internal quotation marks omitted)); *id.* at 34 (observing that because the Price Control Act required the records in question to be kept, they had "public aspects").

**[15]** The mere fact that the government has "formalized its demands in the attire of a statute" does not automatically ascribe "public aspects" to otherwise private documents. *See Marchetti*, 390 U.S. at 57. However, that the information sought is traditionally private and personal as opposed to business-related does not automatically implicate the Fifth Amendment. Where personal information is compelled in furtherance of a valid regulatory scheme, as is the case here, that information assumes a public aspect. *See Byers*, 402 U.S. at 431-32 (holding that a California statutory requirement that drivers involved in automobile accidents provide their names and addresses to police did not infringe on the Fifth Amendment privilege because "[d]isclosure of name and address is an essentially neutral act. Whatever the collateral consequences of disclosing name and address, the statutory purpose is to implement the state police power to regulate use of motor vehicles"). Similarly, disclosure of basic account information is an "essentially neutral" act necessary for effective regulation of offshore banking.

M.H. argues that the records in question, even if they are essentially regulatory, lack public aspects because "nothing in the record keeping provision of the BSA requires [M.H.] to produce bank records to the Government." However, we have held that a regulation need not have an express reporting requirement in order to have public aspects. *See Rosenberg*, 515 F.2d at 199-200 (finding no Fifth Amendment violation even though the statute required records to be kept but not produced (citing *Shapiro*, 335 U.S. 1, and *Grosso*, 390 U.S. at 68)).

Furthermore, as we have already noted, § 1010.420 *does* require M.H. to produce to the Government the information being sought upon request, as long as that request is authorized by law. The regulation states that records "shall be retained for a period of 5 years and shall be kept at all times available for inspection as authorized by law." § 1010.420. Additionally, the information required to be kept under

§ 1010.420 is the same information disclosed in FBAR forms. For purposes of the Required Records Doctrine, it does not matter whether the production of that information is requested through a subpoena (as in this case and *Shapiro*), a court order (as in *Bouknight*), or the regulation itself (as in *Byers*). *See Marchetti*, 390 U.S. at 56 n.14 (rejecting the argument that "the crucial issue respecting the applicability of *Shapiro* is the method by which information reaches the Government"). Even if § 1010.420 lacked any reporting requirement whatsoever, it would still have public aspects because, as was the case in *Rosenberg*, the documents in question are required to be kept to aid in the enforcement of a valid regulatory scheme.

M.H. next suggests that because the BSA provides that a person need only disclose records "as required by law" and the House report accompanying the legislation specified that the records "will not be made automatically available for law enforcement purposes," the records are not public because they are not "easily accessed" by the Government. But court orders and subpoenas *are* legal processes that prevent law enforcement from automatically retrieving information, and whether a document is easily accessible has nothing to do with whether a document has public aspects. *See Marchetti*, 390 U.S. at 56 n.14; *see also Rosenberg*, 515 F.2d at 199-200. The language "as required by law" does not prevent the sought-after records from assuming public aspects for purposes of the Required Records Doctrine.

M.H.'s argument that, because the law recognizes special privacy interests in bank records and tax documents, those documents cannot have "public aspects" is also flawed. The fact that documents have privacy protections elsewhere does not transform those documents into private documents for the purpose of grand jury proceedings. *See Doe M.D.*, 801 F.2d at 1168 (finding that confidential patient records have "public aspects" for purposes of the Required Records Doctrine and that "expectations of privacy do not negate a finding that there

is a public aspect to the files under the . . . regulatory schemes"); *see also Fisher*, 425 U.S. at 401 ("We adhere to the view that the Fifth Amendment protects against 'compelled self-incrimination, not the disclosure of private information.' " (citation and internal markings omitted)).

M.H. emphasizes decisions from other circuits that have found certain personal income tax documents beyond the scope of the Required Records Doctrine. Those cases are not binding in this Circuit, but even if they were, they fail to support M.H.'s position. For example, M.H. relies heavily on *Smith v. Richert*, 35 F.3d 300, 303 (7th Cir. 1994). There, the court held that where the "production of personal tax records of the character of W-2's and 1099's would have testimonial force and incriminate the taxpayer . . . the required-records doctrine is inapplicable and that production is excused by the self-incrimination clause." *Smith*, 35 F.3d at 304.

But the rationale behind that ruling was that "[t]he decision to become a taxpayer cannot be thought voluntary . . . [because] [a]lmost anyone who works is a taxpayer, along with many who do not." *Id.* at 303. The court reasoned that the obligatory nature of paying taxes was distinguishable from "the case of the individual who enters upon a regulated activity knowing that the maintenance of extensive records available for inspection by the regulatory agency is one of the conditions of engaging in the activity." *Id.* In the latter scenario—which is precisely the situation here because no one is required to participate in the activity of offshore banking—the required records doctrine *would* apply.

Furthermore, in *Smith* the subpoena did not indicate that the records being sought related to a regulated activity, whereas in this case the subpoena so indicates. *See id.* (determining that the Required Records Doctrine did not apply in part because "[n]othing in the subpoena identifies the records sought as records required by the state's agricultural statutes to be kept"). Here, the subpoena explicitly requires the pro-

duction of banking records required to be kept and maintained for inspection pursuant to regulations implemented through the BSA.

**[16]** Finally, M.H. argues that allowing the regulatory nature of a requirement to render it as having "public aspects" allows the exception to swallow the rule that "[t]he Government's anxiety to obtain information known to a private individual does not without more render that information public." *Marchetti*, 390 U.S. at 57. But, as stated above, a statute or regulation "directed at a selective group inherently suspect of criminal activities" fails to render the privilege against self-incrimination inapplicable. *Id.* Determining whether a regulation is essentially regulatory or criminal requires analysis that goes beyond the label Congress or an agency provides, thus safeguarding against the exception swallowing the rule. Furthermore, in this instance, M.H. has not made a compelling argument that the information he is being asked to provide lacks "public aspects" despite its essentially regulatory nature. We therefore conclude that the records in question have public aspects.

## IV

**[17]** Because the records sought through the subpoena fall under the Required Records Doctrine, the Fifth Amendment privilege against self-incrimination is inapplicable, and M.H. may not invoke it to resist compliance with the subpoena's command. *See Doe M.D.*, 801 F.2d at 1167 ("Records that are required to be maintained by law are outside the scope of the privilege [against self-incrimination]."). Because M.H.'s Fifth Amendment privilege is not implicated, we need not address his request for immunity. *Bouknight*, 493 U.S. at 562 (declining to "define the precise limitations that may exist upon the State's ability to use the testimonial aspects of Bouknight's act of production in subsequent criminal proceedings").

The district court's order is AFFIRMED.