[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-13131
_____

D.C. Docket No. GJ 4-10

IN RE: Grand Jury Proceedings, No. 4-10

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(February 7, 2013)

Before HULL, WILSON and HILL, Circuit Judges.

HULL, Circuit Judge:

This appeal concerns a grand jury investigation and the issuance of

subpoenas duces tecum to a target (the "Target") and his wife, which required the

production of records concerning their foreign financial accounts.  The Target and

his wife refused to comply with the subpoenas by producing their records,

asserting their Fifth Amendment privilege against self-incrimination.  The

government moved to compel, pointing out that the Supreme Court has recognized an exception (the "Required Records Exception") to the self-incrimination privilege when certain records are kept pursuant to a valid regulatory scheme. See Shapiro v. United States, 335 U.S. 1, 32–33, 68 S. Ct. 1375, 1391–93 (1948). The government contended that the foreign financial account records sought in this case fell within that Exception. The district court agreed, ruling that the Required Records Exception applied to the subpoenaed records, and therefore, the records were not subject to the Target and his wife's privilege against self-incrimination.

After review and oral argument, we join the three of our sister circuits that have considered the same issue here about foreign financial account records and conclude that the subpoenaed records fall within the Required Records Exception. We thus affirm the district court's grant of the government's motion to compel.

## I. BACKGROUND

The relevant facts are both brief and undisputed. The present appeal arises out of a grand jury investigation in the Northern District of Georgia, jointly conducted by the Internal Revenue Service ("IRS"), the U.S. Department of Justice Tax Division, and the U.S. Attorney's Office (collectively, the "government"). The government suspected that the Target, along with his wife, maintained foreign bank accounts both together and individually. For the years under investigation, the Target and his wife filed joint tax returns. Among other things, the

2

government's investigation focused on the Target and his wife's failures to:

(1) disclose on their tax returns their ownership of or income derived from their

foreign accounts; and (2) file, with the U.S. Department of the Treasury, Forms TD

F 90-22.1, Reports of Foreign Bank and Financial Accounts ("FBAR") for these

alleged accounts.[1]

During the course of its investigation, on June 29, 2011, the grand jury, at

the request of the U.S. Attorney, issued subpoenas <u>duces tecum</u> to both the Target

and his wife.  These subpoenas required the Target and his wife to produce any

foreign financial account records that they were required to keep pursuant to the

federal regulations governing offshore banking.  Specifically, the subpoenas

requested:

> [f]or the tax years 2006 to the present: any and all records required to
> be maintained pursuant to 31 C.F.R. § 103.32 relating to foreign
> financial accounts that you had/have a financial interest in, or
> signature authority over, including records reflecting the name in
> which each such account is maintained, the name and address of the
> foreign bank or other person with whom such account is maintained,
> the type of such account, and the maximum value of each such
> account during each specified year.[2]

---

[1]"Each United States person" must file an FBAR form if that person has a financial interest in, or signature authority over, any financial account or other financial interest maintained in a foreign country.  <u>See</u> 31 U.S.C. § 5314; 31 C.F.R. §§ 1010.350, 1010.420.

[2]On March 31, 2011, 31 C.F.R. § 103.32 became 31 C.F.R. § 1010.420.  <u>Compare</u> 31 C.F.R. § 103.32 (2010) <u>with id.</u> § 1010.420 (2011); <u>see also</u> Transfer and Reorganization of Bank Secrecy Act Regulations, 75 Fed. Reg. 65806-01 (Oct. 26, 2010).

The Target and his wife informed the government that they would not produce the subpoenaed records. Thereafter, on September 20, 2011, the government filed a motion seeking to compel their compliance with the subpoenas. In its motion, filed in the district court, the government argued that the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5311 et seq., and its implementing regulations, required the Target and his wife to keep the foreign financial account records sought by the subpoenas. Because the subpoenas were directed at only those records kept "within the requirements of [the] regulations," the Required Records Exception to the Fifth Amendment privilege against self-incrimination applied, such that the Target and his wife could not resist complying with the subpoenas on Fifth Amendment grounds. The government requested that the district court grant the motion to compel and enter an order directing the Target and his wife "to show cause why they should not be held in contempt for failing to comply with the subpoenas."

The Target and his wife filed a response to the government's motion to compel, arguing that the Required Records Exception did not apply to them based on the particular facts and circumstances of their case.

On November 7, 2011, the district court granted the government's motion to compel. In pertinent part, the district court found that the documents requested in the subpoenas fell within the Required Records Exception because: (1) federal law

4

required the Target and his wife to maintain and make available for inspection records regarding their foreign financial accounts; (2) that recordkeeping requirement, imposed by federal statute and implemented by federal regulations, was part of a civil regulatory scheme that was "'essentially regulatory' and not criminal in nature"; (3) the records were of the sort that "bank customers would customarily keep"; and (4) the records had "public aspects" because they contained information that federal law required the Target and his wife to maintain and make available for inspection by the IRS, as well as report to the Treasury Department. The district court ordered the Target and his wife to produce the subpoenaed foreign financial account records "or be subject to contempt."

The Target and his wife did not comply with the district court's order. On March 5, 2012, the government moved the district court to hold the Target and his wife in contempt, pursuant to 28 U.S.C. § 1826. The district court issued an order holding the Target and his wife in contempt for their failure to comply with the district court's earlier November 7 order. The district court, however, stayed the enforcement of its contempt order pending the outcome of any appeal. The Target and his wife timely appealed.

## II. DISCUSSION

On appeal, the Target[3] argues that he properly invoked his Fifth Amendment privilege against self-incrimination, and that the district court erred in concluding that the Required Records Exception applied to the subpoenaed records. The Target also argues that because his act of producing the subpoenaed records could potentially be incriminating, his Fifth Amendment privilege against self-incrimination should apply to his act of production, as well as applying to the records themselves.[4]

Before discussing these privilege issues, we review the Bank Secrecy Act and its related regulations.

### A.    The Bank Secrecy Act

The Currency and Foreign Transactions Reporting Act of 1970, Pub. L. 91-508, 84 Stat. 1118 (1970), is generally referred to as the Bank Secrecy Act ("BSA"). The BSA's purpose is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings. . . ." 31 U.S.C. § 5311. Section 241 of the BSA, codified at 31

---

[3]Although both the Target and his wife received identical subpoenas and both are appealing the district court's contempt order, we refer to the Target as a singular entity in our discussion, for ease of reference.

[4]"We review the district court's findings of relevant facts for clear error, . . . and review the district court's application of the Fifth Amendment privilege de novo." In re Grand Jury Subpoena Duces Tecum Dated Mar. 25, 2011, 670 F.3d 1335, 1338 (11th Cir. 2012) (citations omitted). In the present case, because the issue on appeal is solely a legal one, our review is de novo. Id.

6

U.S.C. § 5314, provides that the "Secretary of the Treasury shall require a resident or citizen of the United States or a person in, and doing business in, the United States, to keep records, file reports, or keep records and file reports, when the resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency." Id. § 5314(a).  In short, the Secretary of the Treasury must require U.S. citizens and residents, as well as any person doing business in the United States, to "keep records and file reports" regarding their foreign financial transactions and relationships.  See id.

Pursuant to this Section 241 instruction, the Secretary of the Treasury has implemented regulations that require U.S. citizens, residents, and business entities to report their foreign financial accounts to the IRS.  See 31 C.F.R. § 1010.350. Specifically, the reporting regulation requires that:

> Each United States person having a financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons. The form prescribed under section 5314 is the Report of Foreign Bank and Financial Accounts (TD-F 90-22.1), or any successor form.

31 C.F.R. § 1010.350(a) (emphasis added).

A separate regulation mandates that those persons who are required to report foreign financial interests under § 1010.350 retain certain foreign financial records

7

for at least five years, making them "available for inspection as authorized by law." Id. § 1010.420. These foreign financial records must contain (1) "the name in which each such account is maintained"; (2) "the number or other designation of such account"; (3) "the name and address of the foreign bank or other person with whom such account is maintained"; (4) "the type of such account"; and (5) "the maximum value of each such account during the reporting period." Id.[5]

The records named in the subpoenas here mirror the records that § 1010.420 requires persons maintaining foreign financial interests to keep and maintain for government inspection. The information contained in those subpoenaed records is also identical to information that persons subject to § 1010.420 annually report to the U.S. Department of the Treasury through FBAR, Form TD F 90-22.1. Thus, the records at issue contain information that the Target—if he has a foreign financial account and meets other qualifications specified in the BSA—must keep, report to the Treasury Department, and maintain for inspection.

The question here is whether records that federal law requires a person to keep and make available for inspection by the federal government can be

---

[5]We note that the Target has raised no challenge to the constitutionality or legality of either the Bank Secrecy Act or its implementing regulations. And it is plainly within Congress's power to regulate foreign financial transactions undertaken by U.S. citizens and residents by mandating that such financial activity be reported yearly to the federal government. See U.S. CONST. art. I, § 8, cl. 3 (vesting Congress with the authority "[t]o regulate Commerce with foreign Nations"); Cal. Bankers Ass'n v. Shultz, 416 U.S. 21, 59, 94 S. Ct. 1494, 1516 (1974) (upholding the constitutionality of the Bank Secrecy Act, noting that "[t]he plenary authority of Congress to regulate foreign commerce, and to delegate significant portions of this power to the Executive, is well established").

subpoenaed by the government in a grand jury investigation when the holder of the records asserts his Fifth Amendment privilege against self-incrimination. We now turn to a discussion of the Fifth Amendment and the Required Records Exception to that Amendment's privilege against self-incrimination.

**B.      The Fifth Amendment's Privilege against Self-Incrimination**

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ." This provision applies "when the accused is compelled to make a [t]estimonial [c]ommunication that is incriminating." Fisher v. United States, 425 U.S. 391, 408, 96 S. Ct. 1569, 1579 (1976); see also United States v. Doe, 465 U.S. 605, 610, 104 S. Ct. 1237, 1241 (1984) ("[T]he Fifth Amendment protects [a] person . . . from compelled self-incrimination.").

Courts have interpreted broadly what constitutes a "testimonial communication." In Fisher, the Supreme Court stated that "[t]he act of producing evidence in response to a subpoena . . . has communicative aspects of its own, wholly aside from the contents of the papers produced." 425 U.S. at 410, 96 S. Ct. at 1581; see also Doe, 465 U.S. at  612, 104 S. Ct. at 1242 ("A government subpoena compels the holder of the document to perform an act that may have testimonial aspects and an incriminating effect."). For instance, by complying with a subpoena, the subpoena recipient may "tacitly concede[ ] the existence of the

9

papers demanded and their possession or control," as well as his "belief that the papers are those described in the subpoena." Fisher, 425 U.S. at 410, 96 S. Ct. at 1581; see also Baltimore City Dep't of Soc. Servs. v. Bouknight, 493 U.S. 549, 554–55, 110 S. Ct. 900, 904–05 (1990) ("[T]he act of complying with the government's demand testifies to the existence, possession, or authenticity of the things produced."). The issue then becomes whether the "tacit averments" made by producing the requested materials are both "'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment." Fisher, 425 U.S. at 410, 96 S. Ct. at 1581; see also In re Three Grand Jury Subpoenas Duces Tecum Dated Jan. 29, 1999, 191 F.3d 173, 178 (2d Cir. 1999) ("[I]t is now settled that an individual may claim an act of production privilege to decline to produce documents, the contents of which are not privileged, where the act of production is, itself, (1) compelled, (2) testimonial, and (3) incriminating.").

## C.    The Required Records Exception

Although the Fifth Amendment protects an individual against self-incrimination by barring the government from "compelling [him] to give 'testimony' that incriminates him," its protective shield is not absolute. Fisher, 425 U.S. at 409, 96 S. Ct. at 1580. In some instances, Congress may, without violating an individual's Fifth Amendment privilege, require that individual "to report information to the government," despite the fact that the information "may

incriminate the individual." United States v. Garcia-Cordero, 610 F.3d 613, 616 (11th Cir. 2010).

Of relevance to the present case, the Supreme Court has made clear that when the government is authorized to regulate an activity, an individual's Fifth Amendment privilege does not prevent the government from imposing recordkeeping, inspection, and reporting requirements as part of a valid regulatory scheme. See Shapiro v. United States, 335 U.S. 1, 32–33, 68 S. Ct. 1375, 1391–93 (1948). Based on the Required Records Exception, the government may mandate the retention or inspection of records as "to public documents in public offices, [and] also [as] to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." Id. at 17, 68 S. Ct. at 1384 (quoting Wilson v. United States, 221 U.S. 361, 380, 31 S. Ct. 538, 544 (1911)).

The rationale underlying the Required Records Exception is "twofold." In re Two Grand Jury Subpoenae Duces Tecum, 793 F.2d 69, 73 (2d Cir. 1986). First, voluntary participation in an activity that, by law or statute, mandates recordkeeping may be deemed a waiver of the act of production privilege because the "obligations to keep and produce the records are in a sense consented to as a condition of being able to carry on the regulated activity involved." In re Grand

11

Jury Proceedings ("McCoy & Sussman"), 601 F.2d 162, 171 (5th Cir. 1979).[6]

Second, because such recordkeeping is done pursuant to legal mandate, "the mere

response by production is no more a violation of the privilege against

self-incrimination than requiring the creation of the record itself, for it is the

record, presumably, that might incriminate [the recordholder]." Id.; see also Two

Grand Jury Subpoenae, 793 F.2d at 73 ("[B]ecause the records must be kept by

law, the record-holder 'admits' little in the way of control or authentication by

producing them.").

Building on Shapiro, the Supreme Court later articulated three "premises" or

elements of the Required Records Exception in a pair of cases that dealt with

whether the Exception applied to the payment of an excise tax on illegal gambling

wagers. See Grosso v. United States, 390 U.S. 62, 67–68, 88 S. Ct. 709, 713

(1968); Marchetti v. United States, 390 U.S. 39, 56–57, 88 S. Ct. 697, 707 (1968).

The Supreme Court described the three "premises" as follows: (1) "the purposes of

the United States' inquiry must be essentially regulatory"; (2) the "information is

to be obtained by requiring the preservation of records of a kind which the

regulated party has customarily kept"; and (3) "the records themselves must have

assumed 'public aspects' which render them at least analogous to public

---

[6]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

documents." Grosso, 390 U.S. at 67–68, 88 S. Ct. at 713.  Concluding that the Required Records Exception was inapplicable in Grosso and Marchetti, the Supreme Court stressed that any recordkeeping or inspection requirement under Shapiro must be directed at "an essentially non-criminal and regulatory area of inquiry,"  Marchetti, 390 U.S. at 57, 88 S. Ct. at 707, rather than "directed almost exclusively to individuals inherently suspect of criminal activities," Grosso, 390 U.S. at 68, 88 S. Ct. at 713.

In the nearly 45 years that have elapsed since the Supreme Court laid out the Required Records Exception's three "premises" in Grosso and Marchetti, many of our sister circuits have recognized and applied these "premises" as though they were elements of the Required Records Exception.  See, e.g., In re Grand Jury Subpoena, 696 F.3d 428, 432–36 (5th Cir. 2012); In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011, 691 F.3d 903, 905–09 (7th Cir. 2012), petition for cert. filed, 2013 WL 152456 (U.S. Jan. 9, 2013) (No. 12-853); In re Grand Jury Investigation M.H., 648 F.3d 1067, 1071–79 (9th Cir. 2011), cert. denied, 133 S. Ct. 26 (2012); In re Grand Jury Subpoena ("Spano"), 21 F.3d 226, 228–30 (8th Cir. 1994); In re Grand Jury Subpoena Duces Tecum Served upon Underhill ("Underhill"), 781 F.2d 64, 67–70 (6th Cir. 1986); United States v. Dichne, 612 F.2d 632, 638–41 (2d Cir. 1979); United States v. Webb, 398 F.2d 553, 556 (4th Cir. 1968).

13

Importantly here, in several of these cases—In re M.H. (9th Cir.), Grand Jury Subpoena Dated Sept. 12, 2011 (7th Cir.), and In re Grand Jury Subpoena (5th Cir.)—our sister circuits upheld the application of the Required Records Exception to individuals who were served with subpoenas that sought the production of financial records required to be kept pursuant to the BSA and its implementing regulations.  In re Grand Jury Subpoena, 696 F.3d at 430–31; Grand Jury Subpoena Dated Sept. 12, 2011, 691 F.3d at 909;  In re M.H., 648 F.3d at 1069; see also Dichne, 612 F.2d at 638–41 (applying the Required Records Exception to the BSA's currency reporting requirements).

D.    **Analysis—Application of the Required Records Exception**

With this analytical framework in place, we now turn to our application of the Required Records Exception to the particular records at issue here.  For the reasons set forth below, we conclude that the government has met its burden of proving that the foreign financial account documents sought from the Target, which the BSA and its implementing regulations require him to maintain, satisfy the "premises" of the Required Records Exception.[7]  Because the Exception

---

[7]Our predecessor Court, the Fifth Circuit, applied the first and third "premises"—the "essentially regulatory" and "public aspects" elements—but did not explicitly mention the "customarily kept" element.  See McCoy & Sussman, 601 F.2d at 167–71; cf. Garcia-Cordero, 610 F.3d at 616–18 (discussing and applying the "regulatory regime exception" to the Fifth Amendment, in a case that did not involve physical records, without mention of a "customarily kept" element).  In light of this precedent, the government encourages us to apply only the first and third "premises" in the present case.  We need not decide if the second "premise" or element applies because, like the Fifth Circuit in its more recent decision, even if we were to "assume, for

14

applies, both the documents themselves and the act of producing them fall outside

the purview of the Fifth Amendment.

     1.     "Essentially Regulatory"

The Target argues that the text of the BSA and its legislative history indicate

Congress intended for the recordkeeping and reporting requirements imposed on

foreign financial accountholders to aid law enforcement, and therefore, that the

purpose of the Act is criminal in nature rather than "essentially regulatory."

Grosso, 390 U.S. at 67–68, 88 S. Ct. at 713.  He asserts that because the Act lists

first among its purposes the gathering of information that has a "high degree of

usefulness in criminal, tax, or regulatory investigations," 31 U.S.C. § 5311

(emphasis added), the Act's chief purpose is to fight crime.

The Target also acknowledges, however, that the BSA has multiple

purposes.  That a statute relates both to criminal law and to civil regulatory matters

does not strip the statute of its status as "essentially regulatory."  See Cal. Bankers

Ass'n v. Shultz, 416 U.S. 21, 76–77, 94 S. Ct. 1494, 1525 (1974); In re Grand Jury

Subpoena, 696 F.3d at 434–35; In re M.H., 648 F.3d at 1074.  In Shultz, the

Supreme Court observed that the goal of assisting in the enforcement of criminal

laws "was undoubtedly prominant [sic] in the minds of the legislators," as they

---

purposes of decision, that all three prongs of the test set forth in Grosso apply," we would nevertheless "conclude that all three requirements are met in this case."  In re Grand Jury Subpoena, 696 F.3d at 433–34 (quoting In re M.H., 648 F.3d at 1073).

15

considered the Bank Secrecy Act.  Shultz, 416 U.S. at 76–77, 94 S. Ct. at 1525.

The Supreme Court further observed that "Congress seems to have been equally

concerned with civil liability which might go undetected by reason of transactions

of the type required to be recorded or reported. . . ."  Id. at 76, 94 S. Ct. at 1525.

The Supreme Court therefore concluded that "the fact that a legislative enactment

manifests a concern for the enforcement of the criminal law does not cast any

generalized pall of constitutional suspicion over it."  Id. at 77, 94 S. Ct. at 1525.

Furthermore, the BSA also requires records to be kept "where [the records]

have a high degree of usefulness in criminal, tax, or regulatory investigations. . . ."

31 U.S.C. § 5311 (emphasis added).  The House Report, that accompanied the Act,

acknowledged that the Act's recordkeeping and reporting requirements not only

would "aid duly constituted authorities in lawful investigations," but also would

"facilitate the supervision of financial institutions properly subject to federal

supervision" and would "provide for the collection of statistics necessary for the

formulation of monetary and economic policy."  H.R. Rep. No. 91–975 (1970),

reprinted in 1970 U.S.C.C.A.N. 4394, 4405.  As the Fifth Circuit recently noted,

> the Treasury Department shares the information it collects pursuant to the Act's requirements with other agencies—including the Office of the Comptroller of the Currency, the Consumer Financial Protection Bureau, the Federal Reserve Board, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of Thrift Supervision—none of which are empowered to bring criminal prosecutions.

16

In re Grand Jury Subpoena, 696 F.3d at 434–35 (citing 31 U.S.C. § 5319; 31 C.F.R. § 1010.950(a)–(b)).  Furthermore, violations of the BSA can be enforced by civil or criminal means, and Congress emphasized that the availability of civil sanctions is "of great importance in assuring compliance with regulations of the type contemplated by [the BSA]."  H.R. Rep. No. 91–975, reprinted in 1970 U.S.C.C.A.N. 4394, 4405; see 31 U.S.C. §§ 5321(a)(3) and (d), 5322(a) and (b).

Even ignoring the non-criminal purposes of the BSA, the question is not whether Congress was subjectively concerned about crime when enacting the BSA's recordkeeping and reporting provisions, but rather whether these requirements apply exclusively or almost exclusively to people engaged in criminal activity.  See Marchetti, 390 U.S. at 57, 88 S. Ct. at 707.  "Therefore, that Congress aimed to use the BSA as a tool to combat certain criminal activity is insufficient to render the BSA essentially criminal as opposed to essentially regulatory."  In re M.H., 648 F.3d at 1074.

In Dichne, the Second Circuit held that a similar recordkeeping and reporting requirement of the BSA was not subject to the Fifth Amendment's privilege against self-incrimination.  612 F.2d at 638–41.  The provision at issue in Dichne required anyone exporting or importing monetary instruments worth more than $5,000 (now $10,000) to file a report with the Secretary of the Treasury.  See

17

31 U.S.C. § 5316 (previously codified at 31 U.S.C. § 1101). The Second Circuit noted that because "the transportation of such amounts of currency is by no means an illegal act, the District Court was correct in its finding that the reporting requirement was not addressed to a highly selective group inherently suspect of criminal activities." Dichne, 612 F.2d at 639 (internal quotation marks omitted). The Second Circuit therefore held that "[i]n view of the lack of a direct linkage between the required disclosure and the potential criminal activity, and in view of the fact that the statute is not directed at an inherently suspect group, . . . the reporting requirement does not present such a substantial risk of incrimination so as to outweigh the governmental interest in requiring such a disclosure." Id. at 641 (internal quotation marks omitted).  Consequently, activity required by the BSA statute was not subject to the Fifth Amendment's privilege against self-incrimination. Id.; see also United States v. Sturman, 951 F.2d 1466, 1487 (6th Cir. 1991) ("The Bank Secrecy Act applies to all persons making foreign deposits, most of whom do so with legally obtained funds. The requirement is imposed in the banking regulatory field which is not infused with criminal statutes.  In addition, the disclosures do not subject the defendant to a real danger of self-incrimination since the source of the funds is not disclosed. . . . Thus, the defendant has failed to show that the Bank Secrecy Act violated any individual right [that] . . . Grosso seek[s] to protect.").

18

The BSA and its implementing regulations at issue here apply to a wide range of individuals. "There is nothing inherently illegal about having or being a beneficiary of an offshore foreign banking account," and "[n]othing about having a foreign bank account on its own suggests a person is engaged in illegal activity." In re M.H., 648 F.3d at 1074. We agree with our three sister circuits that the recordkeeping requirements of the BSA, as implemented by 31 C.F.R. §§ 1010.350 and 1010.420, are essentially regulatory in nature, as they do not target inherently illegal activity or a group of persons inherently suspect of criminal activity. See In re Grand Jury Subpoena, 696 F.3d at 435 (holding that "[b]ecause the BSA's recordkeeping requirements serve purposes unrelated to criminal law enforcement and because the provisions do not exclusively target people engaged in criminal activity, we conclude that the requirements are 'essentially regulatory,' satisfying the [Required Records Exception]'s first prong"); Grand Jury Subpoena Dated September 12, 2011, 691 F.3d at 909 (concluding that the first "premise" of the Required Records Exception, as it pertained to BSA records, was satisfied); In re M.H., 648 F.3d at 1075 (holding that 31 C.F.R. §1010.420 was "essentially regulatory" because the information sought was "not inherently criminal," and therefore, "being required to provide that information would generally not establish a significant link in a chain of evidence tending to prove guilt").

19

For these reasons, we conclude that the requested foreign financial account records satisfy the first "premise" of the Required Records Exception, as the government's interest is "essentially regulatory" in nature.

2.    "Customarily Kept"

The second "premise" of the Required Records Exception examines whether the records sought are of the type typically kept in connection with the regulated activity.  Grosso, 390 U.S. at 68, 88 S. Ct. at 713; Marchetti, 390 U.S. at 57, 88 S. Ct. at 707.  The Target argues that the foreign financial account records sought from him do not satisfy this "premise" because the records generally relate to "secret accounts of which records are normally not maintained."

The Ninth Circuit has held that the foreign financial account information required to be kept under 31 C.F.R. § 1010.420 is "basic account information that bank customers would customarily keep, in part because they must report it to the IRS every year as part of the IRS's regulation of offshore banking, and in part because they need the information to access their foreign bank accounts."  In re M.H., 648 F.3d at 1076. The Fifth Circuit has concluded similarly, stating that foreign financial account records are "customarily kept" in satisfaction of the Required Records Exception's second "premise" where they "are of the same type that the witness must report annually to the IRS pursuant to the IRS's regulation of offshore banking: the name, number, and type of account(s), the name and address

of the bank where an account is held, and the maximum value of the account. . . ." In re Grand Jury Subpoena, 696 F.3d at 435; see also Grand Jury Subpoena Dated Sept. 12, 2011, 691 F.3d at 909 (concluding that the second prong of the Required Records Exception was met).

We agree. Simply put, the Target's argument that these records are not "customarily kept" is a non-starter. In addition to needing these foreign financial account records to comply with tax and Treasury Department reporting obligations, "the records sought are also of the same type that a reasonable account holder would keep in order to access his account." Grand Jury Subpoena, 696 F.3d at 435. We conclude that the subpoenaed foreign financial account records here are of a kind "customarily kept" in connection with the regulated activity of offshore banking, thereby satisfying the second "premise" of the Required Records Exception.

3.    "Public Aspects"

The third "premise" of the Required Records Exception requires that the requested records "have assumed 'public aspects' which render them at least analogous to public documents." Grosso, 390 U.S. at 68, 88 S. Ct. at 713. The Target asserts that an individual's personal financial records do not possess sufficient "public aspects" to satisfy this prong of the test.

21

Generally, "[w]here personal information is compelled in furtherance of a valid regulatory scheme, as is the case here, that information assumes a public aspect." In re M.H., 648 F.3d at 1077. The fact "that the records sought are typically considered private does not bar them from possessing the requisite public aspects." In re Grand Jury Subpoena, 696 F.3d at 436. As we concluded above, the BSA is a valid regulatory regime, and therefore, the information sought pursuant to the Act "assumes a public aspect." In re M.H., 648 F.3d at 1077. The Fifth Circuit noted that "the Treasury Department shares the information it collects pursuant to the [Bank Secrecy] Act's record-keeping and reporting requirements with a number of other agencies. That this data sharing [serves] an important public purpose sufficient to imbue otherwise private foreign bank account records with 'public aspects' is not difficult to imagine." In re Grand Jury Subpoena, 696 F.3d at 436.

The fact that 31 C.F.R. § 1010.420 requires foreign accountholders to keep foreign financial account records, but to file only the TD F 90-22.1 FBAR form concerning those records with the Treasury Department, does not extinguish the public aspects of the records here. The Supreme Court has recognized that there is no material distinction between records required to be kept by law and those regularly or "easily accessed" by the government. See Marchetti, 390 U.S. at 56 n.14, 88 S. Ct. at 706 n.14 ("We perceive no meaningful difference between an

22

obligation to maintain records for inspection, and such an obligation supplemented by a requirement that those records be filed periodically with officers of the United States.").

Thus, this Court finds that the Target's records sought here have "public aspects," satisfying the third and final "premise" of the Required Records Exception. See Grand Jury Subpoena Dated Sept. 12, 2011, 691 F.3d at 909 (concluding that respondent could not resist a subpoena on Fifth Amendment grounds because the requested records met the three prongs of the Required Records Exception).[8]

## E.    The Act-of-Production Privilege

We now address the Target's contention that the Required Records Exception is not applicable to a case such as this where the act of producing the records would be compelled, testimonial, and self-incriminating. We reject the Target's attempt to draw a distinction, for Fifth Amendment privilege purposes,

---

[8]We also reject the Target's argument that the Required Records Exception is only triggered where there is some level of licensure or heightened government regulation at issue. We agree with the government's position that it is up to Congress to determinate the appropriate level of regulation that should accompany its mandate that certain records be kept. We note that the Fifth Circuit recently arrived at the same conclusion, holding that "[i]f the witness's argument were correct, then Congress would be prohibited from imposing the least regulatory burden necessary; it would instead be required to supplement a reporting or recordkeeping scheme with additional and unnecessary 'substantive restrictions' for the sole purpose of upholding its record keeping and reporting requirements," and thus, "adopting a rule that the legitimacy of a recordkeeping requirement depends on Congress first enacting substantive restrictions would lead to absurd results." In re Grand Jury Subpoena, 696 F.3d at 436 (internal quotations omitted).

23

between his act of producing the records and the records themselves.  As the

Seventh Circuit has persuasively stated,

> [o]ne of the rationales, if not the main rationale, behind the Required Records Doctrine is that the government or a regulatory agency should have the means, over an assertion of the Fifth Amendment Privilege, to inspect the records it requires an individual to keep <u>as a condition of voluntarily participating in that regulated activity</u>.  That goal would be easily frustrated if the Required Records Doctrine were inapplicable whenever the act of production privilege was invoked.
>
> <u>The voluntary choice to engage in an activity that imposes record-keeping requirements under a valid civil regulatory scheme carries consequences, perhaps the most significant of which, is the possibility that those records might have to be turned over upon demand, notwithstanding any Fifth Amendment privilege</u>.  That is true whether the privilege arises by virtue of the contents of the documents or [by the] act of producing them.

<u>Grand Jury Subpoena dated Sept. 12, 2011</u>, 691 F.3d at 908–09 (citations omitted)

(emphasis added).

Although the Supreme Court decided its "act-of-production" privilege cases

<u>after</u> it decided <u>Shapiro</u>, <u>Grosso</u>, and <u>Marchetti</u>, it has since applied the rationale

behind the Required Records Exception to negate a witness's act-of-production

privilege.  <u>See</u> <u>Bouknight</u>, 493 U.S. at 555–62, 110 S. Ct. at 905–09 (holding, in a

case involving a mother's refusal, on Fifth Amendment grounds, to comply with a

court order to turn her child over to a social services agency, "[e]ven assuming that

this limited testimonial assertion is sufficiently incriminating and 'sufficiently

testimonial for purposes of the privilege,' Bouknight may not invoke the privilege

24

to resist the production order because she has assumed custodial duties related to production and because production is required as part of a noncriminal regulatory regime" (citation omitted)); see also Spano, 21 F.3d at 228–30 (holding that "the required records exception to the Fifth Amendment privilege will apply to the act of production by a sole proprietor even where the act of production could involve compelled testimonial self-incrimination"); Underhill, 781 F.2d at 70 ("In our view, in order to have meaning the required records exception must apply to the act of production as well as the contents of documents to which the doctrine applies.").

Indeed, in McCoy & Sussman, our predecessor Court determined that the act-of-production privilege discussed in Fisher was "not directed at the production of 'required records,'" and that "[t]he proper designation by the government of certain records to be kept by an individual necessarily implies an obligation to produce them." 601 F.2d at 170–71. The Court added that the "obligation to keep and produce the records are in a sense consented to as a condition of being able to carry on the regulated activity involved." Id. at 171. Further, "[i]n this respect, the mere response by production is no more a violation of the privilege against self-incrimination than requiring the creation of the record itself, for it is the record, presumably, that might incriminate." Id.[9]

---

[9]McCoy was the sole proprietor and operator of a customshouse brokerage office. McCoy & Sussman, 601 F.2d at 166. Representatives of the U.S. Customs Service sought to inspect McCoy's records "in accordance with regulations [19 C.F.R. §§ 111.21 et seq.] requiring

We likewise reject the Target's assertion that the resolution of this question is controlled by our decision in United States v. Argomaniz, 925 F.2d 1349 (11th Cir. 1991). In Argomaniz, this Court concluded that a criminal defendant was entitled to invoke his Fifth Amendment privilege against self-incrimination as it pertained to his act of producing incriminating business records to the IRS. 925 F.2d at 1355–56. However, the Argomaniz Court did not address the Required Records Exception as it pertained to the defendant's assertion of privilege, and there is no indication that the records sought by the IRS in Argomaniz were records that the defendant was required by federal law to maintain, present for inspection, or file pursuant to a valid exercise of congressional authority. Accordingly, Argomaniz is materially distinguishable from the present case.

In sum, to the extent that the Required Records Exception operates to extinguish the Target's Fifth Amendment privilege against self-incrimination, it necessarily extinguishes this privilege as to both the act of producing the records and the records themselves.

---

customshouse brokers to maintain records of their business and allow access to them." Id. McCoy refused to permit the inspection. Id. As part of a grand jury investigation, McCoy was later served with a subpoena duces tecum requiring the production of certain records. Id. McCoy contended that "even if the subpoena were limited to 'required records,' he would be privileged from producing the records because the mere act of producing them would be, in effect, testimonial." Id. at 170. This Court rejected that contention as to "required records." Id. at 170–71.

### III.  CONCLUSION

For the reasons stated above, and after oral argument and our review of the record in the present case, we affirm the district court's order granting the government's motion to compel the Target and his wife to comply with the subpoenas <u>duces tecum</u> for their foreign financial account records.[10]

**AFFIRMED.**

---

[10]In this appeal, the government has never sought any oral testimony from the Target or his wife, and thus this case involves <u>only</u> records and the <u>act</u> of producing those records.

27