**13-403-cv**
*In Re: Grand Jury Subpoena Dated February 2, 2012*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

——————

August Term, 2013

(Argued: August 22, 2013     Decided: December 19, 2013 )

Docket No. 13-403-cv

——————

IN RE: GRAND JURY SUBPOENA DATED FEBRUARY 2, 2012

——————

UNITED STATES OF AMERICA,

*Movant-Appellee,*

-v.-

JOHN DOE,

*Respondent-Appellant.*

——————

Before:

WINTER, WESLEY, AND CARNEY, *Circuit Judges.*

——————

1

John Doe appeals from a contempt order and an order compelling him to comply with a grand jury subpoena dated February 2, 2012, entered in the United States District Court for the Eastern District of New York (Joseph F. Bianco, *Judge*). The subpoena seeks records of Doe's foreign banks accounts, which the Bank Secrecy Act requires United States resident account holders in foreign banks to maintain. See 31 C.F.R. § 1010.420. Doe resists, asserting that the Fifth Amendment privilege against self-incrimination applies to his production of the requested documents. The district court held that the "required records" exception to the privilege applies; Doe contends both that the exception no longer exists and that, if it does, it does not apply. Finding these arguments unpersuasive, we AFFIRM the judgment of the district court.

AFFIRMED.

———————

ROBERT S. FINK (Caroline Rule, Brian P. Ketcham, *on the brief*), Kostelanetz & Fink, LLP, New York, NY, *for Appellant John Doe*.

ALEXANDER P. ROBBINS (Kathryn Keneally, Assistant Attorney General, Frank P. Cihlar, Chief, Criminal Appeals & Tax Enforcement Policy Section, Gregory Victor Davis, Attorney, Tax Division, United States Department of Justice, *on the brief*), for Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, NY, *for Appellee United States America*.

Marc L. Greenwald, Cleland B. Welton II, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for* Amicus Curiae *New York Council of Defense Lawyers*.

———————

WESLEY, *Circuit Judge*:

John Doe appeals from a contempt order and an order compelling him to comply with a grand jury subpoena entered in the United States District Court for the Eastern District of New York (Joseph F. Bianco, *Judge*). With respect to any foreign bank accounts in which Doe has a financial interest, the subpoena seeks records that the Bank Secrecy Act("BSA") requires Doe to maintain. *See* 31 C.F.R. § 1010.420. Doe resists, asserting that the Fifth Amendment privilege against self-incrimination applies to his delivery of the requested documents. The district court held that requiring Doe to produce the subpoenaed documents, over his objections, did not violate Doe's right against self incrimination because that the documents were "required records" – records whose creation and preservation serves a legitimate governmental regulatory interest. *In re Grand Jury Subpoena Dated February 2, 2012*, 908 F. Supp.2d 348, 352 (E.D.N.Y. 2012). Doe contends both that the "required records" doctrine no longer exists and that, if it does, it does not apply to his case. We are not persuaded and AFFIRM the judgment of the district court.

## Background

A federal grand jury in the Eastern District of New York issued a subpoena to Doe calling for him to produce records of his foreign bank accounts, including the names of the account holders, the banks, the account numbers, the type of the account, and the maximum value of the account[1] – all information that must by law be reported to the Commissioner of Internal Revenue. 31 C.F.R. §§ 1010.350, 1010.420. Doe did not comply. The government moved to compel Doe to produce the documents and Doe continued to resist. The district court granted the government's motion. *Subpoena Dated February 2, 2012*, 908 F. Supp.2d 348. Doe still refused to comply, and thereafter the district court entered an order holding Doe in contempt for failure to produce the records. The court imposed a sanction (suspended pending his appeal) of $1,000 per day until he complies.

---

[1] Specifically, the grand jury's subpoena requested production of:

Any and all records required to be maintained pursuant to 31 C.F.R. § 1010.420 (formerly 31 C.F.R. § 103.32) for the past 5 years relating to foreign financial bank, securities, or other financial accounts in a foreign country for which [Doe] had/ha[s] a financial interest in, or signature or other authority over and [is] required by law to file a Report of Foreign Bank and Financial Account (FBAR). The records required to be maintained pursuant to 31 C.F.R. § 1010.420 (formerly 31 U.S.C. § 103.32) include records that contain the name in which each such account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period.

**Discussion**

Doe contends that the Fifth Amendment insulates him from a contempt order based on his refusal to comply.  He claims that the grand jury's subpoena requires him either to produce documents that might incriminate him or to confirm that he failed to register his foreign bank accounts, which itself could be incriminating.  The government counters that while Doe might otherwise have legitimate Fifth Amendment concerns, the subject documents are records required by federal law, and that the government has a legitimate regulatory interest in requiring Doe, and others like him, to maintain records of offshore accounts.  Accordingly, the government contends, it is entitled to demand that Doe produce the records.  Thus, we are presented with the question of whether the subpoenaed records fall within the aptly named "required records" exception to the Fifth Amendment act of production privilege.  We hold that it does.

## I.    The Act of Production Privilege under the Fifth Amendment

The Fifth Amendment act of production privilege was first articulated in *Fisher v. United States*, 425 U.S. 391 (1976).  *Fisher* recognizes that the Fifth Amendment privilege might protect an individual from being required to produce documents, even if the documents' contents are not protected by the

5

privilege, when the witness's simple act of producing the documents could be used against the witness – for example, in those cases when the simple fact that the witness possessed the documents would be incriminating.

In *Fisher* the Court addressed a consolidated challenge by two clients whose lawyers were compelled to produce their tax records. Accountants had prepared each client's tax records and given them to their respective clients, who in turn gave them to their attorneys for legal advice. 425 U.S. at 394. The Court held:

> The act of producing evidence in response to a subpoena . . . has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena.

*Id.* at 410. In *Fisher*, the only incriminating aspect of the documents was their content, not their existence. *Id.* at 412. As a result, the privilege did not apply.

The *Fisher* Court noted that previously the "proposition that the Fifth Amendment prevents compelled production of documents over objection that such production might incriminate stem[med] from *Boyd v. United States*, 116 U.S. 616 [(1886)]." 425 U.S. at 405. However, the Court described *Boyd*'s protections

of private papers – heavily dependent on the theory that the privacy interests protected in the Fourth Amendment also figure in Fifth Amendment inquiries – as "a rule searching for a rationale consistent with the proscriptions of the Fifth Amendment against compelling a person to give 'testimony' that incriminates him." *Id.* at 409. Instead of reaffirming *Boyd*'s private / public distinction, *Fisher* articulated a new way of thinking about the Fifth Amendment privilege.[2]

Over 24 years after *Fisher*, the Court articulated a robust act of production privilege in *United States v. Hubbell*, a wire fraud prosecution stemming from the Whitewater investigation. 530 U.S. 27 (2000). Hubbell resisted initial subpoenas by asserting his Fifth Amendment rights; the government granted him use immunity for the act of production and then indicted him based on the content – rather than the production – of the 13,120 pages of documents that he produced. *Id.* at 45. The Court held that the content of the documents could not be used

---

[2] The precise extent to which *Fisher* and subsequent cases constituted a repudiation of *Boyd* and its reasoning is debated, but scholars appear to agree that the Court sought to find similar constitutional protections without relying on *Boyd*'s analysis. *Compare* Samuel A. Alito, Jr., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. 27, 51 (1986) ("While seeming to reject the entire framework on which *Boyd* rested, *Fisher* stopped short of expressly overruling *Boyd*) *with* RONALD JAY ALLEN ET AL., COMPREHENSIVE CRIMINAL PROCEDURE 308 (2d ed. 2005) ("The Court continued its reconstruction of *Boyd* in Fisher v. United States.").

against Hubbell, in light of the testimonial nature of Hubbell's extensive efforts in identifying and producing them. *Id.* at 43-46.

> The documents did not magically appear in the prosecutor's office like 'manna from heaven.' They arrived there only after respondent asserted his constitutional privilege, received a grant of immunity, and-under the compulsion of the District Court's order-took the mental and physical steps necessary to provide the prosecutor with an accurate inventory of the many sources of potentially incriminating evidence sought by the subpoena.

*Id.* at 42. The Court differentiated *Fisher*, where "the IRS knew [that the subpoenaed documents] were in the possession of the taxpayers' attorneys." *Id.* at 44. In *Hubbell*, the government had "not shown that it had any prior knowledge of either the existence or the whereabouts of the 13,120 pages of documents ultimately produced by respondent." *Id.* at 45. "It was unquestionably necessary for respondent to make extensive use of 'the contents of his own mind' in identifying the hundreds of documents responsive to the requests in the subpoena." *Id.* at 43 (quoting *Curcio v. United States*, 354 U.S. 118, 128 (1957)). The government was therefore forbidden to use even the contents of the records and the court affirmed the dismissal of the indictment. *Id.* at 46.

The privilege has thus evolved since its inception to a broader prophylactic regime that, in certain circumstances, protects individuals from producing

documents where they are incriminated by the *contents* of the documents. *See id.*

As applied, the privilege is practical; it inoculates people from being forced to

contribute to their own prosecution while not unduly restricting grand juries'

ability to seek the truth. Doe argues – and the government does not

meaningfully contest – that absent an exception, the act of production privilege

shields Doe from complying with the grand jury's subpoena.

## II.     The Required Records Doctrine

### A.     Background

#### 1.  Origins and Interpretations

The act of production privilege contains exceptions, and among them is the

required records doctrine, first articulated in *Shapiro v. United States*, 335 U.S. 1

(1948). The required records exception applies only when the Fifth Amendment

privilege would otherwise allow a witness to avoid producing incriminating

documents. It abrogates the protection of the privilege for a subset of those

documents that must be maintained by law.

*Shapiro* was a prosecution of a fruit purveyor for illegal pricing under the

Emergency Price Control Act during the Second World War. *Id.* at 3. Shapiro,

the wholesaler, was served with a subpoena in September 1944 for invoices and

9

other business information "required to be kept pursuant to [Section 14 of Maximum Price Regulation 426, 8 Fed. Reg. 9546 (1943)] 271 and 426." *Id.* at 4-5. Although the Court acknowledged "that there are limits which the government cannot constitutionally exceed in requiring the keeping of records which may be . . . used in prosecuting statutory violations committed by the record-keeper himself," the Court nonetheless compelled un-immunized disclosure of these documents. *Id.* at 32.

Subsequently, the Court set forth a three-factor test to determine whether documents are "required records." "[F]irst, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents." *Grosso v. United States*, 390 U.S. 62, 67-68 (1968).

In *Grosso*'s sister case, the Court applied the three-factor test to find the required records exception inapplicable. *Marchetti v. United States*, 390 U.S. 39 (1968). Marchetti asserted his Fifth Amendment privilege in response to a prosecution under a statutory scheme that required illegal gamblers to register

10

and pay an occupational tax. *Id.* at 41 (1968); *see also Grosso*, 390 U.S. at 64. Marchetti was not inclined to disclose his illegal gambling for good reason. By maintaining receipts of his illegal gambling successes (or failures) he admitted to a crime. Those who break the law understandably are unlikely to register their misdeeds with the government.

Even assuming that the "United States' principal interest [was] the collection of revenue, and not the punishment of gamblers," the Court found that *Shapiro* was distinguishable. *Marchetti*, 390 U.S. at 57. The records were not "of the same kind as he has customarily kept;"[3] there were no "public aspects . . . to the records at issue;" and the records were collected about a group largely or entirely defined by their illegal activities. *Id.* (internal quotation marks omitted); *see also Grosso*, 390 U.S. at 68 (deciding the same thing in the context of a gambler's refusal to pay excise taxes and the occupation tax because "[h]ere, as in *Marchetti*, the statutory obligations are directed almost exclusively to individuals inherently suspect of criminal activities"). Marchetti's refusal to comply with the

---

[3] Indeed, it seems plausible that a gambler would not keep any records relating to his gambling activities. The Court needed only to note that the information required was "unrelated to any records which [Marchetti] may have maintained[] about his wagering activities." *Marchetti*, 390 U.S. at 57.

11

statute was protected by the Fifth Amendment and not subject to the required

records exception. *Id.* at 60. His conviction was overturned.

## 2. Interaction with the act of production privilege

Doe and *amicus* contend that the required records doctrine is no longer

valid or that it applies only in exigent circumstances. To support this argument,

they point out that *Shapiro* was a wartime case that drew heavily on the reasoning

of *Boyd v. United States*, 116 U.S. 616 (1886), which has been either reconfigured or

abrogated by the *Fisher* line of cases. Prior precedents of this Court squarely

foreclose this argument.

Courts have consistently applied the required records doctrine and its

analytical framework as an exception to the Fifth Amendment privilege, long

after the expiration of any exigency. *See, e.g., Baltimore City Dep't of Social Servs. v.*

*Bouknight*, 493 U.S. 549, 556-559 (1990). This Court has twice explicitly rejected

the idea that the required records exception has been abrogated by the act of

production cases. *In re Two Grand Jury Subpoenae Duces Tecum Dated Aug. 21,*

*1985*, 793 F.2d 69, 73 (2d Cir. 1986) ("*Two Subpoenae*"); *In re Doe*, 711 F.2d 1187,

1192-93 (2d Cir. 1983).

12

A psychiatrist associated with a clinic that freely distributed quaaludes to patients without medical need was required to turn over subpoenaed W-2 and prescription forms along with patient files. *In re Doe*, 711 F.2d at 1189. Conceding that "even *Shapiro* recognizes constitutional limits on the government's power to compel record keeping which might circumvent the privilege contained in the Fifth Amendment," we held that "there [wa]s a strong correlation between the purpose of the New York law which require[d] that patient files be kept and that for which their production [wa]s sought." *Id.* at 1192. Finally, we rejected the argument that the act of production privilege recognized in *Fisher* shielded the state-required records from disclosure:

> [T]he required records doctrine is an *exception* to the Fifth Amendment privilege. As such, it necessarily overrides the privilege in instances in which the privilege would otherwise apply. *Fisher* was not concerned with required records and nothing in its analysis could be construed as weakening the required records exception.

*Id.* at 1192-93 (emphasis in original, internal citations omitted).

Three years later, an attorney appealed a contempt order entered because of his failure to comply with subpoenas related to contingency fee arrangements with his clients. *Two Subpoenae*, 793 F.2d at 70. After noting that the fee documents were not covered by the attorney-client privilege, this Court rejected

13

the lawyer's Fifth Amendment argument based in part on the fact "that the subpoenaed retainer agreements and closing statements . . . fall within the 'required records' exception to the fifth amendment." *Id.* at 73. Although the lawyer "claim[ed] that the 'required records' exception to the fifth amendment is no longer valid after the Supreme Court's decision in *United States v. Doe*, 465 U.S. 605 [(1984)]," we noted that "*Doe* did not involve required records, and [found] nothing in its 'act of production' analysis that c[ould] be construed as weakening the required records exception." *Id.* (internal citation omitted). We further explained the rationale for the required records exception:

> First, if a person conducts an activity in which record-keeping is required by statute or rule, he may be deemed to have waived his privilege with respect to the act of production – at least in cases in which there is a nexus between the government's production request and the purpose of the record-keeping requirement. Second, because the records must be kept by law, the record-holder 'admits' little in the way of control or authentication by producing them.

*Two Subpoenae*, 793 F.2d at 73.[4]

---

[4] Doe argues that the rationale for the survival of the required records doctrine does not apply in his case. However, we view this argument as relating to the applicability of the exception to his current case. Insofar as his attempt to distinguish *Two Subpoenae* challenges the continued existence of the required records exception, this argument has been squarely foreclosed by our prior precedents.

14

Based in part on the *Two Subpoenae* reasoning, this Court still recognizes the required records exception. In 2008, we applied the exception to information obtained from immigrants from specified countries who had responded to a mandatory registration program following the attacks of September 11, 2001. *See Rajah v. Mukasey*, 544 F.3d 427, 433, 442 (2d Cir. 2008). Information obtained under this program was ultimately used by the government in the immigrants' deportation proceedings. This Court denied the immigrants' attempts to block the use of the records through the Fifth Amendment because "the Fifth Amendment's act of production privilege does not cover records that are required to be kept pursuant to a civil regulatory regime." *Id.* at 442. The required records exception remains a part of Fifth Amendment jurisprudence.

B.      **Application of the Required Records Doctrine to the BSA**

Applying the *Grosso* test, several circuits have specifically held that the required records exception applies to cases indistinguishable from the present cases. *See United States v. Under Seal*, – F.3d —, No. 13-4267 (4th Cir. Dec. 13, 2013); *In re Grand Jury Proceedings, No. 4-10*, 707 F.3d 1262 (11th Cir. 2013); *In re Grand Jury Subpoena*, 696 F.3d 428 (5th Cir. 2012); *In re Special February 2011-1 Grand Jury Subpoena Dated September 12, 2011*, 691 F.3d 903 (7th Cir. 2012); *In re*

15

*M.H.*, 648 F.3d 1067 (9th Cir. 2011). For the reasons stated below, we agree with our sister circuits.

### 1. The "essentially regulatory" test

The first *Grosso* prong asks whether the record requirement is "essentially regulatory." This precludes Congress from circumventing the Fifth Amendment privilege by enacting comprehensive legislation "directed at a 'selective group inherently suspect of criminal activities.'" *Marchetti*, 390 U.S. at 57 (quoting *Albertson v. Subversive Activities Control Bd.*, 382 U.S. 70, 79 (1965)). When legislation is not "directed at the public at large" and concerns "an area permeated with criminal statutes," courts are more likely to hold that the required records exception does not apply. *Albertson*, 382 U.S. at 79. In addition to illegal gambling, courts have declined to apply the required records exception to records regarding marijuana sales, ownership of dangerous firearms, and other "area[s] permeated with criminal statutes," *Haynes v. United States*, 390 U.S. 85, 99 (1968) (internal quotation marks omitted), but have applied the exception in the context of drivers involved in automobile accidents, custodians of state-supervised children, and even various sections of the BSA.

16

Determining the target population of a statute is frequently difficult. In *California v. Byers*, 402 U.S. 424, 430 (1971), the Supreme Court examined a California statute in the context of "all persons who drive automobiles in California," despite the statute's facial applicability only to people who have been involved in automobile accidents resulting in damage to property. *Id.* "Driving an automobile, unlike gambling, is a lawful activity. Moreover, it is not a criminal offense under California law to be a driver 'involved in an accident.'" *Id.* at 431.

Similarly, this Court upheld a conviction under the BSA for failure to report carrying over $5,000 in cash when leaving the country. *United States v. Dichne*, 612 F.2d 632, 633 (2d Cir. 1979). We noted that the reporting requirement had incriminating potential while also serving legitimate social interests; as a result, "a balance must be struck between the competing interest of the state and the individual when evaluating the constitutionality of a disclosure requirement." *Id.* at 638 (citing *Byers*, 402 U.S. at 427). Because "the transportation of such amounts of currency is by no means an illegal act" in itself, "as such [the statute] cannot be faulted as being aimed at an inherently suspect group." *Id.* at 639-40. "In each of the Supreme Court cases holding a reporting

17

requirement invalid, the reporting individual was required to reveal to the Government information which would almost necessarily provide the basis for criminal proceedings against him for the very activity that he was required to disclose." *Id.* at 640. Insofar as transporting large amounts of money across international borders is indicative of other illegal activity, this is still short of requiring reporting from users of marijuana or gamblers, who would be reporting the exact activity for which they would be susceptible for prosecution.

*Dichne* and other cases concluding that the BSA's purpose is "essentially regulatory" are informative but not dispositive with respect to the provisions at issue here. Our inquiry is not whether the BSA as a whole was motivated by civil or criminal concerns, but rather whether the specific section in question is "essentially regulatory" or directed at "'an area permeated with criminal statutes.'" *Byers*, 402 U.S. at 430 (quoting *Albertson*, 382 U.S. at 79).

The record keeping regulation at issue here, 31 C.F.R. § 1010.420, targets those engaged in the lawful activity of owning a foreign bank account. "There is nothing inherently illegal about having or being a beneficiary of an offshore foreign bank account." *M.H.*, 648 F.3d at 1074. Doe's protestations notwithstanding, owners of these accounts are not "inherently suspect" and the statute is "essentially regulatory."

18

Doe's argument that the statute is criminally focused has some force. The BSA declares that its purpose is "to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities, including analysis, to protect against international terrorism." 31 U.S.C. § 5311. It does list "criminal investigations" first, but this multifaceted statute clearly contributes to civil and intelligence efforts wholly unrelated to any criminal purpose.[5]

---

[5] Doe points out that the Treasury Department's Financial Crimes Enforcement Network (FinCEN) lists the BSA as one of the tools that it uses to pursue its goals of criminal investigation. It is neither surprising nor persuasive that a law enforcement organization uses a multi-purposed statute for law enforcement ends. We assume that insofar as the Central Intelligence Agency uses the BSA, it uses it for intelligence and counter-intelligence purposes, while the Internal Revenue Service uses it for revenue collection purposes. Doe asserts that "[t]he government has never pointed to a 'regulatory' act that FinCEN performs with FBAR [Report of Foreign Bank and Financial Account] data." Doe Brief at 35. However, other agencies also use the data obtained through the challenged reports:

> The Treasury Department shares the information it collects pursuant to the Act's requirements with other agencies—including the Office of the Comptroller of the Currency, the Consumer Financial Protection Bureau, the Federal Reserve Board, the Federal Deposit Insurance Corporation, the National Credit Union Administration, and the Office of Thrift Supervision—none of which are empowered to bring criminal prosecutions.

*Grand Jury Proceedings, No. 4-10*, 707 F.3d at 1271 (quoting *Grand Jury Subpoena*, 696 F.3d at 434).

19

Although portions of the statute's legislative history support Doe's characterization of the BSA as focused on criminal activity, "[t]he Supreme Court has already considered and rejected these arguments as they relate to the BSA generally." *M.H.*, 648 F.3d at 1074 (citing *Cal. Bankers' Ass'n v. Shultz*, 416 U.S. 21, 76-77 (1974)). Moreover, "the question is not whether Congress was subjectively concerned about crime when enacting the BSA's recordkeeping and reporting provisions, but rather whether these requirements apply exclusively or almost exclusively to people engaged in criminal activity." *Grand Jury Proceedings, No. 4-10*, 707 F.3d at 1271; *accord Grand Jury Subpoena*, 696 F.3d at 434. Looking beyond "Congressional subjective intent" – if there could be such a thing – the BSA has considerable regulatory utility outside of the criminal justice context.

The question becomes whether a statute with mixed criminal and civil purposes can be "essentially regulatory" with respect to the required records exception. We agree with our sister circuits: the fact "[t]hat a statute relates both to criminal law and to civil regulatory matters does not strip the statute of its status as 'essentially regulatory.'" *Grand Jury Proceedings, No. 4-10*, 707 F.3d at 1270. Because people owning foreign bank accounts are not inherently guilty of criminal activity, the BSA's applicable recordkeeping requirement, designed to

20

facilitate "criminal, tax, or regulatory investigations or proceedings, or [] the conduct of intelligence or counterintelligence activities," 31 U.S.C. § 5311, is still essentially regulatory.

Doe argues that our reliance on *Dichne* and other cases involving *ex post* challenges to the validity of statutory reporting requirements are distinguishable from individual assertions of the privilege against self-incrimination. These two categories of challenges are indeed distinct. However, Supreme Court precedent asks us to inquire into the purposes of the regulatory scheme pursuant to which records are required – a necessarily generalized inquiry, and a matter discussed in cases like *Dichne*. 612 F.2d at 640. Besides, in this case – as in *Shapiro* itself – the witness asserted the privilege against self-incrimination in response to the subpoena issued. *See Shapiro*, 335 U.S. at 4-5. "*Shapiro* did more than set the constitutional parameters for record-keeping requirements; it determined that the Fifth Amendment is not a barrier to the enforcement of a valid civil regulatory scheme." *Special February 2011-1 Grand Jury Subpoena Dated September 12, 2011*, 691 F.3d at 907. The fact that the specific records sought would support a criminal prosecution did not defeat the "essentially regulatory" prong in that case; the analysis does not come out differently here. The BSA's recordkeeping

21

requirement at issue, 31 C.F.R. § 1010.420, is "essentially regulatory" for the purposes of the required records analysis.

## 2. The "customarily kept" requirement

The second *Grosso* prong requires that the regulated "information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept." *Grosso*, 390 U.S. at 68.[6]  Doe points to no cases in which any court has held that records are not required because they are not "customarily kept."

The records required by 31 C.F.R. § 1010.420 are very basic – they "shall contain the name in which each [] account is maintained, the number or other designation of such account, the name and address of the foreign bank or other person with whom such account is maintained, the type of such account, and the maximum value of each such account during the reporting period."  In determining that the records at issue are "customarily kept," the district court

---

[6] Citing *Bouknight*, the Government urges us to hold that this is no longer a requirement of the required records doctrine.  Although *Bouknight* did not discuss the second *Grosso* prong, it was an atypical "required records" case that does not dictate our analysis here, as the regulated "evidence" was Bouknight's infant.  *See* 493 U.S. at 556-62.  Perhaps the *Bouknight* Court did not feel it necessary to discuss whether a child is "customarily kept" by his parents.  We need not decide this issue for the purposes of this opinion as the "customarily kept" prong is easily met here.

22

relied in large part on the fact that another section of the BSA requires foreign

account holders to report substantially identical information to the IRS. *See* 31

C.F.R. § 1010.350(a). Doe contends that this reasoning is "tautological" in that it

permits Congress to manufacture a "custom" in order to satisfy the required

records doctrine by requiring that the records be kept. We need not address

whether, in another case, records "customarily kept" *only* because they are

required by law satisfy the prerequisites of the required records doctrine.

Here, the grand jury's subpoena seeks information so basic that the

"argument that these records are not 'customarily kept' is a non-starter." *Grand

Jury Proceedings, No. 4-10*, 707 F.3d at 1273. "A bank account's beneficiary

necessarily has access to such essential information as the bank's name, the

maximum amount held in the account each year, and the account number."

*M.H.*, 648 F.3d at 1076. "[C]ommon sense" dictates that beneficiaries keep these

records "in part because they need the information to access their foreign bank

accounts." *Id.* The amount of money in the account is relevant to most foreign

bank account holders in that many people are regularly forced to assess

prospective purchases against the balance of their accounts. Most people check a

bank account before making a major purchase; not everyone who holds a foreign

bank account could, without a second thought, incur (for example) vast litigation costs in a feckless attempt to avoid paying lawfully-imposed taxes vital to the functioning of the United States without needing to assess whether losing such a challenge would leave them incapable of paying the inevitable hefty sanctions. And even if the account holder is a person of great wealth surely they want to know where that wealth is located.

Doe believes that, despite the basic presumption that bank account owners know the location of their money, some individuals engaged in wrongdoing are advised not to keep even this basic information.[7]  But even if those who possess foreign bank accounts for the purposes of avoiding some specific U.S. tax or criminal laws may be less likely to maintain these records, the BSA covers the entire group of foreign bank account holders.  We decline to look at the custom of only the miscreants among the larger group of foreign bank account holders.

### 3. The "public aspects" prong

The third *Grosso* prong asks whether the required records "'have assumed 'public aspects' which render them at least analogous to public documents.'"

---

[7] Even if we were to look at only the customs of criminal circles, if a criminal don't have this information, how can he retrieve his ill gotten gains?  He must either possess a photographic memory or well-encrypted devices hidden in some offshore location.

*Grand Jury Proceedings, No. 4-10,* 707 F.3d at 1273 (quoting *Grosso*, 390 U.S. at 68). The parties dispute the meaning of the "public aspects" test, which – as a vestige of *Boyd* – may not have the same legal significance as it did in 1948, when the public / private distinction was of paramount importance. *Cf. Fisher*, 425 U.S. at 400-01, Samuel A. Alito, Jr., *Documents and the Privilege against Self-Incrimination*, 48 U. PITT. L. REV. 27, 36-44 (1986).

Doe urges us to hold that the test requires one of three factors: records have "public aspects" when they "are a direct mainstay of a regulatory scheme that promotes the public welfare," "are vital to a regulatory regime promulgated in response to emergency or other exigent conditions," or "are *routinely* forwarded to a regulatory or licensing body as a means of protecting the public." Doe Brief at 49-50. Although he cites to authority in support of the proposition that each of these is sufficient to establish "public aspects," we see no evidence that one of these three prongs must be met to conclude that the records have a "public aspect."

"The Government's anxiety to obtain information known to a private individual does not without more render that information public. Nor does it stamp information with a public character that the Government has formalized

25

its demands in the attire of a statute." *Marchetti*, 390 U.S. at 57. *Marchetti* restricts Congress's ability to require records for the purpose of securing access to otherwise-private information. However, "records required to be kept pursuant to valid regulatory programs have a 'public aspect' for purposes of constitutional analysis, and thus are not private papers entitled to the protection of the fourth or fifth amendments." *Donovan v. Mehlenbacher*, 652 F.2d 228, 231 (2d Cir. 1981). "Where personal information is compelled in furtherance of a valid regulatory scheme, as is the case here, that information assumes a public aspect." *M.H.*, 648 F.3d at 1077.

The rule distilled from *Donovan* and *Marchetti* is that records required to be created under an *otherwise valid* regulatory regime necessarily have "public aspects" for purposes of the required records exception to the Fifth Amendment production privilege. A constitutionally infirm statute cannot recharacterize private information as public. However, information that a statute lawfully requires a person to record is legally distinct from information that no statute lawfully requires anyone to record. This distinction is what the "public aspects" prong of the required records doctrine recognizes. The record need not be 'public' in that anyone can examine or copy it at any time; it need only be lawfully required to be kept.

Doe's argument that the exception applies only in areas in which there are already "substantive restrictions" in place is unpersuasive. "If the witness's argument were correct, then Congress would be prohibited from imposing the least regulatory burden necessary; it would instead be required to supplement a reporting or recordkeeping scheme with additional and unnecessary 'substantive restrictions' for the sole purpose of upholding its record keeping and reporting requirements." *Grand Jury Subpoena*, 696 F.3d at 436. It is enough that Congress *could* prohibit an activity to permit it to validly require records to be kept; it need not actively prohibit – or otherwise significantly restrict – possession of foreign bank accounts to give force to its recordkeeping requirements.

The BSA is an otherwise-valid regulatory scheme that lawfully requires beneficiaries of foreign bank accounts to retain records containing the basic information about their accounts. 31 C.F.R. § 1010.420. This information, required by lawful statute, has the "public aspects" that make it potentially subject to a grand jury subpoena in a case where a witness could assert the Fifth Amendment privilege to shield more distinctly private information. The "required records" exception to the privilege therefore applies in this case.

\*\*\*

27

Doe's additional arguments are unpersuasive. Doe asserts that production of records required to be kept may be compelled only when the record keeper sought a related government benefit or license and thus may fairly be said to have deliberately waived her Fifth Amendment privilege with respect to those records by engaging in the regulated activity. He declares that the Fifth Amendment cannot inadvertently be waived, and because (he asserts) beneficiaries of foreign bank accounts are frequently unaware of the BSA's recordkeeping requirements, they cannot be deemed to have waived their Fifth Amendment rights with respect to banking records .

Even if the latter assertion (regarding ignorance of the law's recordkeeping requirements) were true – a proposition that we seriously doubt – this argument fails for two reasons. First, the Supreme Court has strongly hinted that, while a waiver must be voluntary, there is no requirement "of any 'knowing' and 'intelligent' waiver" of Fifth Amendment rights. *Schneckloth v. Bustamonte*, 412 U.S. 218, 237 n.18 (1973). Second, the Fifth Amendment is inapplicable where the testimonial act does not create a related risk of self-incrimination. Because the BSA only criminalizes a knowing and willful failure to engage in the required recordkeeping, an account owner who was truly unaware of the recordkeeping

28

requirement would not incur related criminal sanctions by acknowledging in response to a production order his negligent failure to maintain the required records.[8]  31 U.S.C. § 5322.  Thus, for the criminal provisions to apply in the first place, this must be a case where an "individual [] enters upon a regulated activity knowing that the maintenance of extensive records available for inspection by the regulatory agency is one of the conditions of engaging in the activity."  *Smith v. Richert*, 35 F.3d 300, 303 (7th Cir. 1994).

Finally, Doe's assertion that the government could obtain his records only by granting him immunity relies on the inapplicability of the required records exception; here, production of the required records could be compelled without first offering Doe immunity.

## Conclusion

The required records exception to the Fifth Amendment privilege against self-incrimination still exists.  The BSA's requirements at issue here are "essentially regulatory," the subpoenaed records are "customarily kept," and the

---

[8] Although it is not necessary to our resolution of this case in which Doe has not alleged ignorance of the BSA's recordkeeping requirements, the government's brief acknowledges that "an individual who was unaware that he was engaging in a regulated activity would not be able to establish a risk of self-incrimination in the first place."  Appellee Brief at 38 n.17.

records have "public aspects" sufficient to render the exception applicable. Because Doe cannot lawfully excuse his failure to comply with the subpoena, the district court was within its discretion to impose sanctions for his non-compliance.

For the foregoing reasons, the opinion and order of the district court is **AFFIRMED.**