**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 14-4465

———————————

UNITED STATES OF AMERICA

v.

ELI CHABOT;
RENEE CHABOT,

Appellants

———————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-14-cv-03055)
District Judge: Honorable Freda L. Wolfson

———————————

Argued June 8, 2015

Before: AMBRO and COWEN, <u>Circuit Judges</u>,
and RESTANI,[*] <u>Judge</u>.

(Opinion filed: July 17, 2015)

———————————

[*] Honorable Jane A. Restani, Judge for the United States
Court of International Trade, sitting by designation.

Vivek Chandrasekhar, Esq.
Richard A. Levine, Esq. **(Argued)**
Roberts & Holland LLP
825 8th Avenue, 37th Floor
New York, NY 10019

      Counsel for Appellants

Robert J. Branman, I, Esq. **(Argued)**
Robert W. Metzler, Esq.
United States Department of Justice, Tax Division
950 Pennsylvania Avenue, N.W.
Room 4635
P.O. Box 502
Washington, DC 20044

      Counsel for Appellee

_____

OPINION OF THE COURT
_____

RESTANI, <u>Judge</u>

Eli and Renee Chabot ("the Chabots") appeal the District Court's grant of the Internal Revenue Service's ("IRS") petition to enforce summonses for foreign bank account records that 31 C.F.R. § 1010.420 requires the Chabots to keep. Today we join six other circuits in holding that these records fall within the required records exception to the Fifth Amendment privilege. Accordingly, we will affirm the District Court's grant of the IRS's petition.

# I. Background

In April 2010, the IRS received information from French authorities concerning United States persons[1] with undisclosed bank accounts at HSBC Bank. The IRS alleges that it has information regarding accounts held by Pelsa Business Inc. ("Pelsa") for the years 2005 through 2007. According to the information provided to the IRS, Eli Chabot is the beneficial owner of Pelsa.

On June 20, 2012, the IRS issued summonses to Eli and Renee Chabot requesting that they appear on July 13, 2012, to give testimony and produce documents about their foreign bank accounts for the period from January 1, 2006, to December 31, 2009.[2] The Chabots' attorney notified the IRS that the Chabots would not appear, were asserting their Fifth Amendment privilege against self-incrimination, and would not produce the requested documents. The IRS amended the two summonses on November 16, 2012, limiting their scope to only those documents required to be maintained under 31 C.F.R. § 1010.420. The Chabots continued to claim the Fifth Amendment privilege, and the IRS filed a petition to enforce the amended summonses on May 14, 2014.

---

[1] "United States person" is defined in 31 C.F.R. § 1010.350(b). The parties do not dispute that the Chabots or their business are United States persons.

[2] The IRS had issued an earlier summons on March 12, 2012, requesting that the Chabots appear to testify. The Chabots appeared on May 12, 2012, but asserted their Fifth Amendment privilege and refused to answer any of the IRS's questions about their foreign bank accounts.

Before the District Court, the Chabots claimed that, although the contents of the records sought might not be protected by the Fifth Amendment, their act of producing the documents was protected. The Chabots specifically claimed that responding to the summonses might subject them to prosecution for their failure to file the same information in an annual Report of Foreign Bank and Financial Accounts. The Chabots also claimed that any exception to the Fifth Amendment privilege based on the required records exception should not apply in this case. The District Court held that the required records exception applied and thus the Fifth Amendment did not prohibit production of the documents sought. The District Court therefore granted the petition to enforce the summonses.

## II.  Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 26 U.S.C. § 7402(b) and 26 U.S.C. § 7604(a) (2012). We exercise jurisdiction pursuant to 28 U.S.C. § 1291. Whether enforcement of a summons violates the Fifth Amendment privilege is a mixed question of law and fact. United States v. Ins. Consultants of Knox, Inc., 187 F.3d 755, 759 (7th Cir. 1999). Here, the question before us is purely one of law, and we review de novo the District Court's application of the Fifth Amendment privilege and the required records exception to the present facts. In re Grand Jury Proceedings, 707 F.3d 1262, 1266 n.4 (11th Cir. 2013).

## III.  Discussion

On appeal, the Chabots' arguments can be summarized as follows: (1) allowing the government to rely on the required records exception to enforce the summonses in this case will lead to general governmental abrogation of the Fifth Amendment privilege for any "failure to report" crime;

4

(2) the information that would be gleaned from compliance with the summonses is almost identical to what the government needs to charge the Chabots with the felony of willful failure to report an overseas account in the Report of Foreign Bank and Financial Accounts, thus requiring the Chabots to incriminate themselves; and (3) the records that 31 C.F.R. § 1010.420 requires accountholders to keep do not satisfy the three-pronged test for applying the required records exception to the Fifth Amendment privilege. The government's response to these arguments is simple. It argues that the Chabots' records fall within the required records exception to the Fifth Amendment privilege. Therefore, the questions before the panel are whether the Chabots' account records fall within the required records exception to the Fifth Amendment privilege and, if so, whether the Chabots' policy concerns are insurmountable barriers to our application of this exception. Unpersuaded by the overriding effect of the stated concerns, we conclude that the Chabots' account records fall squarely within the required records exception to the Fifth Amendment privilege. Therefore, we will affirm the District Court's grant of the IRS's petition.

### A. The Development of the Required Records Exception to the Fifth Amendment Privilege

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. An individual may claim this privilege if compelled to produce self-incriminating, "testimonial communication[s]." Fisher v. United States, 425 U.S. 391, 408 (1976). The act of producing documents may trigger the Fifth Amendment privilege. See id. at 410. This is because, by producing documents, one acknowledges that the documents exist, admits that the documents are in one's custody, and concedes that the documents are those that the

subpoena requests. Id. When these "testimonial" aspects of compelled production are self-incriminating, the Fifth Amendment privilege applies. See id. at 410–12.

In Shapiro v. United States, the Supreme Court first articulated the required records exception to the Fifth Amendment privilege. 335 U.S. 1, 32–33 (1948); In re Grand Jury Subpoena Dated Feb. 2, 2012, 741 F.3d 339, 344 (2d Cir. 2013) (hereinafter "Doe"). When Shapiro was decided, private papers were entitled to Fifth Amendment protection based on their private status. See 335 U.S. at 33–34. Public papers, however, did not have Fifth Amendment protection. See id. at 5. In Shapiro, the Supreme Court qualified this distinction when it held that the Fifth Amendment privilege did not apply to certain private papers that the law required a person to keep. Id. at 33. The Supreme Court subsequently fleshed out Shapiro's holding in Grosso v. United States, wherein it explained that the following three prongs must be met in order for records to fall within the "required records" exception: (1) the reporting or recordkeeping scheme must have an essentially regulatory purpose; (2) a person must customarily keep the records that the scheme requires him to keep; and (3) the records must have "public aspects." 390 U.S. 62, 67–68 (1968).

Fisher, which found no Fifth Amendment privilege because the involved taxpayers were not the persons compelled to produce, appeared to shift the focus away from the private/public distinction in determining whether compelled production of records violates the Fifth Amendment privilege.[3] See 425 U.S. at 397, 400–01.

---

[3] The degree to which Fisher represents a complete repudiation of the private/public distinction remains unsettled. It has been stated that the general consensus is that Fisher was

Despite this somewhat altered view of how the Fifth Amendment relates to the production of documents, courts have continued to rely on the required records exception. See, e.g., Balt. City Dep't of Soc. Servs. v. Bouknight, 493 U.S. 549, 555–56 (1990) (recognizing the principle behind the required records exception abrogated respondent's act-of-production privilege even though her compliance with a court order to produce her child would have aided in her prosecution); Doe, 741 F.3d at 342–43, 346 (applying the required records exception to the respondent's act-of-production privilege where his compliance with a grand jury's subpoena for account records would have aided in criminal proceedings against him).

Courts have offered several reasons for continuing to apply the required records exception to the Fifth Amendment privilege, even though the threshold framework for applying the privilege to documents appears to have changed to a degree. The first is, engaging in an activity for which Congress conditions participation upon recordkeeping effectively waives the right to invoke the Fifth Amendment privilege to prevent compelled disclosure of such records. In re Two Grand Jury Subpoenae Duces Tecum Dated Aug. 21, 1985, 793 F.2d 69, 73 (2d Cir. 1986). The next, and perhaps weaker, is, because "the records must be kept by law, the record-holder 'admits' little in the way of control or authentication by producing them." Id. And the last is, continued application of the required records exception is vital in order to protect the government's legitimate interest in using the records that it requires individuals to keep. See, e.g., Bouknight, 493 U.S. at 556 ("The Court has on several

---

an attempt to find Fifth Amendment protections applicable to compelled production of documents without relying on the private/public distinction. Doe, 741 F.3d at 343 n.2.

occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws."); In re Grand Jury Proceedings, 707 F.3d at 1274 (citing In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011, 691 F.3d 903, 908–09 (7th Cir. 2012)). These reasons support application of the exception under either the private/public framework or the act-of-production framework. Thus, the required records exception has retained its vitality as an exception to the Fifth Amendment privilege against self-incrimination. See Bouknight, 493 U.S. at 554–62.

### B. The Government's Ability to Use the Required Records Exception to Abrogate the Fifth Amendment Privilege

The Chabots predict that inclusion of their account records in the required records exception will encourage the government to make excessive use of the exception in order to abrogate the Fifth Amendment privilege for any "failure to report" crime. The Chabots also suggest that this would allow the government to abrogate the Fifth Amendment more generally by creating a host of record-retention or reporting requirements. Because there is significant overlap between this argument and the first prong of the required records exception, we address only briefly the Chabots' argument here.

In Shapiro, the Supreme Court explained that there was little danger of Congress completely abrogating the Fifth Amendment privilege as long as the records that Congress required individuals to keep closely served the purpose of a valid, civil regulation. Shapiro, 335 U.S. at 32–33. In that case, the Emergency Price Control Act was a valid exercise of Congress's power to set commodity prices during wartime

8

that required vendors to keep records of their sales.  Id. at 5 n.3, 32–33.  Because these sale records closely served the Act's legitimate regulatory purpose, the Court concluded that inclusion of the petitioner's sales records in the required records exception was a far cry from Congress's total abrogation of the Fifth Amendment privilege for any and all crimes.  See id. at 4–5, 32–33.  In short, because of the required records exception's exclusive application to valid, regulatory recordkeeping schemes, the government cannot simply create a recordkeeping requirement in order to prosecute crimes, such as a willful failure to report offense.  See In re Grand Jury Investigation M.H., 648 F.3d 1067, 1075, 1078 (9th Cir. 2011) (hereinafter "M.H.").

In the present case, the government conditions voluntary participation in foreign banking on maintaining records and reporting information regarding foreign bank accounts.  See id. at 1078.  As explained in greater detail regarding the first prong of the Grosso test, the recordkeeping requirement is part of a valid, essentially regulatory scheme.  These records serve legitimate noncriminal purposes, because government agencies use this data for tax collection, development of monetary policy, and conducting intelligence activities.  See United States v. Under Seal, 737 F.3d 330, 335, 337 (4th Cir. 2013) (listing the noncriminal purposes for which government agencies, including the Treasury Department, use account record data); In re Grand Jury Subpoena, 696 F.3d 428, 436 (5th Cir. 2012) (employing similar reasoning).  Therefore, it is unlikely that the government will be able to use the required records exception to abrogate the Fifth Amendment privilege for any and all "failure to report" crimes.

9

## C. Compliance with the Summonses Will Result in Criminal Liability

The Chabots contend that compliance with the IRS's summonses for their account records will provide a "significant link in the chain of evidence" that the government needs to prosecute them for willful failure to report overseas account(s) to the IRS. Appellant's Br. 12. Unfortunately for the Chabots, this argument echoes the familiar yet unsuccessful arguments of other holders of foreign bank accounts who have invoked the Fifth Amendment privilege to prevent compliance with summonses for required records. See, e.g., Doe, 741 F.3d at 342–43, 353 (rejecting same argument).

Courts use prong one of the required records exception to evaluate whether compliance with a recordkeeping scheme is likely to lead to criminal charges as a general matter. Doe, 741 F.3d at 349; M.H., 648 F.3d at 1074–75. If the scheme's main purpose is to force individuals to turn over potentially incriminating evidence to be used in criminal prosecutions, the scheme is not essentially regulatory. See M.H., 648 F.3d at 1075 (concluding that § 1010.420 is essentially regulatory, in part, because the records that it requires accountholders to keep are not inherently incriminating and therefore not significant links in the chain of evidence necessary to bring criminal charges against accountholders). As discussed in further detail infra, production of the records that the IRS seeks is unlikely to lead to criminal proceedings as a general matter, because owning a bank account overseas is not an inherently criminal activity. Id. at 1074.

To the extent that the Chabots argue that production of the requested account records will establish a significant link in the chain of evidence in their particular case, we are not persuaded that this precludes application of the required

10

records exception. The Fifth Amendment applies only if the compelled production is potentially self-incriminating. If producing the documents were not potentially incriminating, the Chabots would have no Fifth Amendment concerns. It is the potentially incriminating nature of production that allows the Chabots to invoke an otherwise valid Fifth Amendment privilege. It is this same potentially incriminating nature that makes the required records exception relevant to the Chabots' account records. See Doe, 741 F.3d at 344. The Chabots' argument appears to boil down to this: the exception to the Fifth Amendment is inapplicable if the Fifth Amendment otherwise would apply. Such an argument is nothing more than a request that the exception be abolished altogether—a request we must reject.

### D. Applying the Required Records Exception to Section 1010.420

As indicated, in Grosso, the Supreme Court set forth the following three-part test for when the required records exception should be applied to the Fifth Amendment privilege:

> [F]irst, the purposes of the United States' inquiry must be essentially regulatory; second, information is to be obtained by requiring the preservation of records of a kind which the regulated party has customarily kept; and third, the records themselves must have assumed 'public aspects' which render them at least analogous to public documents.

390 U.S. at 67–68. Although this is an issue of first impression for this Circuit, the Second, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits previously have applied the required records exception to enforce summonses

11

for the records that 31 C.F.R. § 1010.420 requires accountholders to keep.[4]  Today we join these circuits in applying the required records exception to this "subset of . . . documents that must be maintained by law." Doe, 741 F.3d at 344.

### 1.    Essentially Regulatory Purpose

The Chabots contend that § 1010.420 is a recordkeeping scheme with an essentially criminal purpose. The first prong of the required records exception asks whether a recordkeeping scheme targets an inherently criminal activity and/or an inherently suspicious class of persons. See Doe, 741 F.3d at 347–48; M.H., 648 F.3d at 1075–76. Therefore, we begin our inquiry by determining what and whom § 1010.420 targets. Section 1010.420 regulates foreign bank account ownership, an activity in which people participate for a myriad of legitimate and legal reasons. As the Chabots' counsel recognized at oral argument, someone might own an overseas account to ensure convenient access to money when living, working, or even vacationing abroad. Oral Argument at 13:19, 13:48, United States v. Chabot, (No. 14-4465), available at http://www2.ca3.uscourts.gov/oralargument/audio/14-4465USAv.Chabot,etal.mp3.

---

[4] See In re Grand Jury Subpoena Dated Feb. 2, 2012, 741 F.3d 339 (2d Cir. 2013); United States v. Under Seal, 737 F.3d 330 (4th Cir. 2013); In re Grand Jury Proceedings, 707 F.3d 1262 (11th Cir. 2013); In re Grand Jury Subpoena, 696 F.3d 428 (5th Cir. 2012); In re Special Feb. 2011-1 Grand Jury Subpoena Dated Sept. 12, 2011, 691 F.3d 903 (7th Cir. 2012); In re Grand Jury Investigation M.H., 648 F.3d 1067 (9th Cir. 2011).

In a similar vein, the class of persons who own foreign bank accounts is comprised of law-abiding citizens as well as miscreants. Doe, 741 F.3d at 350–51. On this point, we agree with the Fifth Circuit's conclusion that "the [Bank Secrecy Act]'s record-keeping requirements do not apply exclusively to those engaged in criminal activity." In re Grand Jury Subpoena, 696 F.3d at 435.

Where a recordkeeping scheme exclusively targets those who engage in illegal activities, its purpose is essentially criminal. For example, the Supreme Court held that the statutes at issue in Grosso and Marchetti v. United States were essentially criminal because the regulations at issue exclusively targeted individuals who were engaged in an inherently illegal activity, namely gambling. Grosso, 390 U.S. at 68; Marchetti, 390 U.S. 39, 46–48 (1968). See also Leary v. United States, 395 U.S. 6, 18 (1969) (holding that petitioner's Fifth Amendment privilege was violated when "compliance with the transfer tax provisions [of the Marihuana Tax Act] would have required petitioner unmistakably to identify himself as a member of this 'selective' and 'suspect' group [of individuals who failed to comply with the Act's order form requirement]"); Haynes v. United States, 390 U.S. 85, 96, 100 (1968) (concluding that the registration requirement of the National Firearms Act violated petitioner's Fifth Amendment privilege where the requirement mainly targeted individuals who possessed a firearm but had failed to comply with the Act's other requirements, therefore targeting an inherently suspicious class of persons). Conversely, because § 1010.420 does not apply exclusively, or even largely, to criminals, it does not operate simply as a dragnet for criminals by forcing them to maintain self-incriminating records. Instead, § 1010.420 is an essentially regulatory scheme. See also In re Grand Jury Proceedings, 707 F.3d at 1272 (concluding that § 1010.420 has an essentially regulatory purpose because it targets

13

neither "inherently illegal activity" nor an "inherently suspect" group of individuals).

The Chabots contend that the Financial Crimes Enforcement Network's administration of § 1010.420 evidences the regulation's essentially criminal purpose. The Chabots attempt to bolster their argument by highlighting the fact that the records that § 1010.420 requires accountholders to keep are also useful for potential criminal proceedings against these individuals. As the government asserted at oral argument, "bank records can be very important for . . . a lot of things [that] you might want to investigate about a person." Oral Argument at 27:29. Just because some of these things have criminal aspects does not mean that § 1010.420's purpose is essentially criminal. See, e.g., Under Seal, 737 F.3d at 334–36 (explaining that, despite how useful records maintained under § 1010.420 are to criminal prosecutions, this utility does not negate § 1010.420's other noncriminal purposes).

As the government acknowledged at oral argument, one of Congress's goals in passing the Bank Secrecy Act of 1970 was to reach accountholders who were avoiding U.S. criminal laws. Oral Argument at 27:19. Section 1010.420 was promulgated pursuant to this Act and therefore shares this goal. An equally important objective of both the Act and § 1010.420, however, is to monitor and facilitate compliance with currency regulation and tax laws. Id. at 27:20; see also Under Seal, 737 F.3d at 335 (noting that the Bank Secrecy Act was enacted for "concomitant tax, regulatory, and counterterrorism purposes in addition to its [the Act's] law enforcement goals"). Accordingly, like our sister circuits that have addressed these arguments, we find the Chabots'

arguments that § 1010.420 is an essentially criminal scheme to be unpersuasive.[5]

## 2. Customarily Kept

The Chabots argue that holders of overseas accounts customarily would not keep the records that § 1010.420 requires them to maintain. Though the courts have not settled on a formal definition of "customarily kept," we find instructive the guideline from the Second Circuit that asks whether holders of foreign bank accounts as a general group are likely to keep the records that § 1010.420 requires them to keep, rather than only examining the practices of those individuals who engage in foreign banking solely to avoid U.S. laws. Doe, 741 F.3d at 350–51. As stated succinctly by the Ninth Circuit: "[R]ecords appear to be customarily kept if they would typically be kept in connection with the regulated activity." M.H., 648 F.3d at 1076. Therefore, we begin our inquiry by examining what records those who lawfully engage in foreign banking ordinarily would retain.

Section 1010.420 mandates that owners and beneficiaries of foreign accounts keep the following information accessible for five years: (1) the name on the account, (2) the account number, (3) the name and address of the bank or person with whom the account is maintained, (4) the account type, and (5) the maximum annual account value. 31 C.F.R. § 1010.420. Common sense tells us that this is all information that an accountholder needs in order to access funds located abroad or at home. See M.H., 648 F.3d at 1076 (concluding that the records that § 1010.420 requires individuals to keep contain essential information for accountholders and beneficiaries). Because reasonable

---

[5] See supra note 4.

15

accountholders would retain this information in order to readily access their foreign accounts, we conclude that these are records that accountholders customarily would keep.[6] Doe, 741 F.3d at 350; In re Grand Jury Subpoena, 696 F.3d at 435.

The Chabots' additional contention that no accountholder keeps records of the maximum annual values of his overseas accounts is unpersuasive. Maximum annual account values are simply account balances, and account owners typically keep these numbers on record. See Doe, 741 F.3d at 350; M.H., 648 F.3d at 1076.

The Chabots further argue that even if there are some accountholders who maintain the records that § 1010.420 requires them to keep, they do not retain these records for the five-year period that § 1010.420 mandates. The Chabots, however, misunderstand the inquiry that this prong of the required records exception entails. The "customarily kept" analysis simply asks whether individuals typically would maintain the information that the law requires them to keep, not the length of time for which they normally would do so

---

[6] Though some courts have found the similarity between the type of information contained in the records that § 1010.420 requires accountholders to keep and the information that these individuals must report to the IRS pursuant to § 1010.350 to be additional proof that accountholders customarily keep this information, we find this reasoning to be circular. See, e.g., In re Grand Jury Proceedings, 707 F.3d at 1273; In re Grand Jury Subpoena, 696 F.3d at 435; M.H., 648 F.3d at 1076. On this point, the Chabots aptly note: "The government and the courts seem to say, well, if the government has a regulation that requires this information . . . it's regularly kept because we require you to keep it." Oral Argument at 28:59.

absent the requirement. The Chabots fail to cite any case in which the length of time for which someone usually kept a document affected the court's holding on whether or not the document was customarily kept, and we have been unable to identify any such case. See, e.g., M.H., 648 F.3d at 1076 (explaining that "records appear to be customarily kept if they would typically be kept in connection with the regulated activity"). Furthermore, here, we do not deal with an extraordinarily long time period, but rather one that seems appropriate for taxation and similar purposes.

We therefore conclude that prong two is met.

### 3.    Public Aspects

The Chabots contend that their account records do not have public aspects because owning a foreign bank account is not a public activity. It is undeniable that an individual who holds an overseas account normally does not think of his account records as being equivalent to public records. Nevertheless, "[t]he fact that documents have privacy protections elsewhere does not transform those documents into private documents" for all purposes. M.H., 648 F.3d at 1078. We note that several circuits have reasoned that records required to be kept under a valid, civil regulatory scheme (i.e., meet prong one of the Grosso test) automatically have "public aspects" sufficient to meet the third prong. See, e.g., Doe, 741 F.3d at 352; M.H., 648 F.3d at 1076–77. We need not adopt such a broad holding to conclude that the documents requested here have sufficient "public aspects" to meet the third prong of the Grosso test.

As discussed earlier under the first prong of the Grosso test, § 1010.420 is a valid, civil regulatory scheme, and the Chabots voluntarily participated in the regulated activity, namely foreign banking. When accountholders such as the

17

Chabots voluntarily engage in foreign banking, they effectively waive their Fifth Amendment privilege to prevent the government's compelled disclosure of their account records.[7]  See M.H., 648 F.3d at 1078 (relying on this consent theory in concluding that the appellant's account records satisfied the public aspects prong of the Grosso test); In re Special Feb. 2011-1 Grand Jury Subpoena, 691 F.3d at 909 ("The voluntary choice to engage in an activity that imposes record-keeping requirements under a valid civil regulatory scheme carries consequences, perhaps the most significant of which . . . is the possibility that those records might have to be turned over upon demand, notwithstanding any Fifth Amendment privilege."); cf. Smith v. Richert, 35 F.3d 300,

---

[7] Following oral argument, the Chabots submitted a letter pursuant to Fed. R. App. P. 28(j), citing the Supreme Court's recent decision in Horne v. Department of Agriculture, No. 14-275 (June 22, 2015).  The Chabots cite Horne for the proposition that "while the government may regulate an activity, it may not structure its regulation in a way that abrogates a Constitutional protection, and then point to engagement in such activity as voluntary waiver."  Appellants' Rule 28(j) Letter 2 (July 14, 2015).  The proposition put forward by the Chabots and the language cited for it, which is taken out of context, is far too broad.  The Supreme Court clearly indicated that the specific issue addressed related to takings, not the privilege against self-incrimination (or any other constitutional right for that matter), and that the conclusion it was reaching was specific to the facts presented in that case.  See Horne, Slip Op. at 12 ("The third question presented asks 'Whether a governmental mandate to relinquish specific, identifiable property as a "condition" on permission to engage in commerce effects a per se taking.'  The answer, at least in this case, is yes.").

18

303 (7th Cir. 1994) (holding that production of certain documents necessary to determine personal income tax liability were not within required records exception, because "[t]he decision to become a taxpayer cannot be thought voluntary . . . [as] [a]lmost anyone who works is a taxpayer, along with many who do not"). The government circulates the data from these records to several government agencies, which use this information for a number of important non-criminal purposes. See Under Seal, 737 F.3d at 335, 337 (concluding that the records kept pursuant to § 1010.420 possess public aspects given the Treasury Department's circulation of this data to other government agencies for the purpose of implementing economic, monetary, and regulatory public policies); In re Grand Jury Subpoena, 696 F.3d at 436 (employing similar reasoning). Through these processes, the Chabots' account records acquire public aspects.

The Chabots contend that the absence of a licensing requirement for foreign banking necessarily means that their account records do not have public aspects. This argument, however, does nothing to advance the Chabots' case, because private activities that do not require licenses still may be subject to the required records exception. See Under Seal, 737 F.3d at 337 (refusing to accept appellant's argument that his foreign bank account records were not subject to the required records exception because banking is a private activity which does not require participants to obtain licenses); In re Grand Jury Proceedings, 707 F.3d at 1274 n.8 (same); In re Grand Jury Subpoena, 696 F.3d at 435–36 (same). We conclude that the records sought in this case are sufficiently imbued with "public aspects" to satisfy the third

19

prong of the required records exception.[8]  Thus all three prongs are met.

## IV. Conclusion

The Chabots have failed to raise valid policy or other reasons as to why their account records should not be included in the required records exception to the Fifth Amendment privilege.  Because § 1010.420 is essentially regulatory, requires account owners to retain records that they customarily keep, and requires retention of records that have public aspects, we will affirm the District Court's grant of the IRS's petition.

---

[8] As the interstate commerce power gives Congress the authority to prohibit foreign banking, Congress could impose the lesser restriction of a licensing requirement on foreign banking.  See Cal. Bankers Ass'n v. Shultz, 416 U.S. 21, 46–47 (1974) (noting that "[t]he plenary authority of Congress over both interstate and foreign commerce is not open to dispute, and that body was not limited to any one particular approach to effectuate its concern"); Doe, 741 F.3d at 351–52.  Obviously, this kind of scheme would be considerably more burdensome than § 1010.420's current recordkeeping requirements.